### Ralph COLEMAN, et al., Plaintiffs,

v.

### Edmund G. BROWN, Jr., et al., Defendants.

### No. CIV. S–90–520 LKK/DA (PC).

United States District Court, E.D. California.

Signed April 10, 2014.

As Corrected April 11, 2014.

Aaron Joseph Fischer, Ernest Galvan, Gay Crosthwait Grunfeld, Jane E. Kahn, Kenneth M. Walczak, Krista Michelle Stone–Manista, Lisa Adrienne Ells, Margot Knight Mendelson, Michael Bien, Michael Louis Freedman, Thomas Bengt Nolan, Blake Thompson, Lori Rifkin, Rosen Bien Galvan & Grunfeld LLP, Amy Whelan, Claudia B. Center, Legal Aid Society, Raymond E. Loughrey, Ranjini Acharya, Jeffrey L. Bornstein, Edward P. Sangster, K & L Gates, LLP, San Francisco, CA, Fred D. Heather, Glaser Weil Fink Jacobs Howard Avchen & Shapiro LLP, Los Angeles, CA, Kimberly Hall Barlow, Jones & Mayer, Fullerton, CA, Rebekah B. Evenson, Sara Linda Norman, Donald Specter, Berkeley, CA, for Plaintiffs.

Danielle Felice O'Bannon, Department of Justice, Kyle Anthony Lewis, Jay Craig Russell, Christine Marie Ciccotti, David Eugene Brice, Elise Owens Thorn, Debbie Jean Vorous, Patrick R. McKinney, Neah Huynh, Thomas Stuart Patterson, Attorney General's Office for the State of California, San Francisco, CA, Kevin Allen Voth, California Department of Justice, Sahar Nayeri, CA DOJ, Maneesh Sharma, CA Dept. of Justice, Samantha Derin Wolff, Hanson Bridgett, LLP, San Francisco, CA, Paul B. Mello, Hanson Bridgett LLP, Walnut Creek, CA, Michael R. Capizzi, Law Office of Michael R. Capizzi, Santa Ana, CA, Kimberly Hall Barlow, Jones & Mayer, Fullerton, CA, for Defendants.

## ORDER

LAWRENCE K. KARLTON, Senior District Judge.

In ongoing sequelae to defendants' January 7, 2013 motion to terminate this action (hereafter "termination motion") (ECF No. 4275), two additional motions brought by plaintiffs for enforcement of court orders and affirmative relief are before the court.[1] On May 9, 2013, plaintiffs filed a motion related to housing and treat-

---

1. A third motion related to inpatient mental health care (ECF No. 4543) was filed by plaintiffs on April 11, 2013 and resolved by orders filed July 11, 2013 (ECF No. 4688) and December 10, 2013 (ECF No. 4951).

ment of mentally ill inmates placed in segregation units in California's prison system (ECF No. 4580). On May 29, 2013, plaintiffs filed a motion related to use of force and disciplinary measures against members of the plaintiff class (ECF No. 4638).

The matters at bar were also tendered as grounds for denying defendants' termination motion. *See* Corr. Pls. Opp. To Defs. Motion to Terminate, filed Mar. 19, 2013 (ECF No. 4422) at 58–65; 87–91.[2] The court denied the termination motion by order filed April 5, 2013, *see Coleman v. Brown*, 938 F.Supp.2d 955 (E.D.Cal.2013), and separately set an evidentiary hearing on plaintiffs' motions. In relevant part, evidentiary hearing on plaintiffs' motions commenced on October 1, 2013, continued over twenty-eight court days and concluded on December 9, 2013.[3] Following the filing of closing briefs and responses thereto by the parties, the matters were submitted for decision.[4]

Because the plaintiffs relied in part on the matters considered in this order, the court holds that this order is a further demonstration that the order denying the motion to terminate was properly denied.

Plaintiffs' motions present two questions: First, have defendants sufficiently remedied Eighth Amendment violations in use of force, disciplinary measures, and segregated housing relative to class members, which were identified in the court's 1995 decision on the merits of plaintiffs' Eighth Amendment claims? Second, if the answer to the first question is no, what additional remedial measures are required to end ongoing Eighth Amendment violations in these areas?

At the outset, the court wishes to recognize the overall significant progress the defendants have made relative to providing constitutionally required care to the plaintiffs' class. Indeed, though defendants' motion to terminate was clearly premature, recognition of the progress made is important. Nonetheless, for the reasons discussed below, the answer to the first question is no. The answer to the second question is determined by what the Eighth Amendment requires when seriously mentally ill individuals are incarcerated.

The very difficult questions presented by the motions at bar are a consequence of the fact that California incarcerates tens of thousands of seriously mentally individuals in its state prison system.[5],[6] As

---

**2.** Throughout this order, all citations to page numbers of documents in the court's electronic case file (ECF) are to the ECF page number at the top of each page.

**3.** Approximately five of those days were spent on testimony related to plaintiffs' motion concerning access to inpatient hospital care for inmates on death row (ECF No. 4543). As noted in footnote 1, *supra*, that motion has been resolved by separate order.

**4.** By order filed March 6, 2014 (ECF No. 5095), proceedings on plaintiffs' May 6, 2013 motion were reopened pending defendants' response to documents submitted pursuant to a March 3, 2014 request for judicial notice by plaintiffs. With the filing of defendants' response (ECF No. 5120), plaintiffs' May 6, 2013 motion was resubmitted.

**5.** California is not alone in what the sheriff of Cook County, Illinois has described as "'criminalizing mental illness.'" Kristof, N., "Inside a Mental Hospital Called Jail", New York Times, February 10, 2014. According to Mr. Kristof's article, "[n]ationwide in America, more than three times as many mentally ill people are housed in prisons and jails as in hospitals" and "[s]ome 40 percent of people with serious mental illnesses have been arrested at some point in their lives." *Id.* What Sheriff Dart described about Cook County is equally true of California: "We've systematically shut down all the mental health facilities, so the mentally ill have nowhere else to go. [The prison system has] become the de facto mental health hospital." *Id.* Indeed, it is the court's view that many of the problems giving rise to this suit and ongoing efforts at remediation arise from the inevitable tensions

of September 2013, there were 33,259 inmates identified in the California Department of Corrections and Rehabilitation's (CDCR) outpatient mental health population. Pls. Ex. 2303.[7] The number of mentally ill inmates represents approximately 28.25% of the inmate population housed in CDCR's prison institutions.[8] These inmates received mental health care through the CDCR's Mental Health Services Delivery System (MHSDS), which provides four levels of mental health care. An understanding of the treatment criteria for each level of mental health care is necessary to resolution of the motions at bar.[9]

All members of the plaintiff class suffer from serious mental disorders. The Correctional Clinical Case Management System (CCCMS) provides mental health services to seriously mentally ill inmates with "stable functioning in the general population, Administrative Segregation Unit (ASU) or Security Housing Unit (SHU)" whose mental health symptoms are under control or in "partial remission as a result of treatment." Pls. Ex. 1200, MHSDS Program Guide, 2009 Revision, at 12–1–7. In September 2013, 28,360 mentally ill inmates were at the Correctional Clinical

created by the distinct needs of custody supervision and the distinct need for mental health care.

6. The questions at bar also arise as a consequence of the severe overcrowding that has plagued California's prison system for more than a decade, leading to, *inter alia*, insufficient space for differentiated housing programs, and delays in transfer to appropriate housing. *See* Reply Expert Declaration of James Austin, filed August 23, 2013 (ECF No. 4762) at ¶¶ 39, 44.

7. This represents an increase from the 32,955 inmates in the mental health outpatient population in June 2013. *See* Pls. Ex. 2301.

8. This is based on a total population of 120,162 inmates housed in California's prison institutions, not including camps, as of September 18, 2013. *See* Weekly Report of Population as of Midnight, September 18, 2013, posted in the population reports at www.cdcr.ca.gov.

9. In order to receive treatment in the MHSDS an inmate must meet at least one of three general criteria listed in the Program Guide: 1. Treatment and monitoring are provided to any inmate who has current symptoms and/or requires treatment for the current Diagnostic and Statistical Manual diagnosed (may be provisional) Axis I serious mental disorders listed below:
Schizophrenia (all subtypes)
Delusional Disorder
Schizophreniform Disorder
Schizoaffective Disorder

Brief Psychotic Disorder
Substance–Induced Psychotic Disorder (exclude intoxication and withdrawal)
Psychotic Disorder Due To A General Medical Condition
Psychotic Disorder Not Otherwise Specified
Major Depressive Disorders
Bipolar Disorders I and II
2. *Medical Necessity* Mental health treatment shall be provided as needed. Treatment is continued as needed, after review by an IDTT, for all cases in which:
Mental health intervention is necessary to protect life and/or treat significant disability/dysfunction in an individual diagnosed with or suspected of having a mental disorder. Treatment is continued for these cases only upon reassessment and determination by the IDTT that the significant or life threatening disability/dysfunction continues or regularly recurs.
3. *Exhibitionism* Treatment is required when an inmate has had at least one episode of indecent exposure in the six-month period prior to the IDTT that considers the need for exhibitionism treatment and the inmate patient is either:
● Diagnosed with Exhibitionism, or
● Meets the alternate criteria. (*Alternate Criteria:* An inmate who meets all criteria for the diagnosis of Exhibitionism, except that the victim was not an "unsuspecting stranger" but was a staff member or inmate who did not consent to or encourage the behavior.)
(A diagnosis of Exhibitionism is not required for inmates who meet the alternate criteria.)
Pls. Ex. 1200 at 12–1–5, 12–1–6.

Case Management (CCCMS) level of care. Pls. Ex. 2303.

The remaining three levels of mental health care are for seriously mentally ill inmates who, due to their mental illness, are unable to function in the general prison population. The Enhanced Outpatient Program (EOP) is for inmates with "acute onset or significant decompensation of a serious mental disorder." Pls. Ex. 1200 at 12–1–7, 12–1–8. EOP programs are located in ·designated living units at "hub institution[s]." *Id.* at 12–1–8. In September 2013, 4,538 mentally ill inmates were at the Enhanced Outpatient Program (EOP) level of care. Pls. Ex. 2303.

Mental Health Crisis Beds (MHCBs) are for mentally ill inmates in psychiatric crisis or in need of stabilization pending . transfer either to an inpatient hospital setting or a lower level of care. Pls. Ex. 1200, Program Guide at 12–1–8. MHCBs are generally licensed inpatient units in correctional treatment centers or other licensed facilities. *Id.* at 12–1–9. Stays in MHCBs are limited to not more than ten days. *Id.* at 12–5–1.[10] Finally, several inpatient hospital programs are available for class members. With one exception[11] the inpatient programs are operated by the Department of State Hospitals (DSH). *Id.* at 12–1–9. Some of those programs are on the grounds of state prisons, while others are in existing state hospitals.

In addition to the foregoing, resolution of the motions at bar turns on understanding the nature of the inquiry before the court. In relevant part, in 1995 this court found that "seriously mentally ill inmates [are] being treated with punitive measures by the custody staff to control the inmates' behavior without regard to the cause of the behavior, the efficacy of such measures, or the impact of those measures on the inmates' mental illnesses." *Coleman v. Wilson,* 912 F.Supp. 1282, 1320 (E.D.Cal. 1995). The court also found that "mentally ill inmates are placed in administrative segregation and segregated housing without any evaluation of their mental status, because such placement will cause further decompensation, and because inmates are denied access to necessary mental health care while they are housed in administrative segregation and/or segregated housing." *Id.* at 1320. Finally, the court found that "weapons are used on inmates with serious mental disorders without regard to the impact of those weapons on their psychiatric condition, and without penological justification." *Id.* at 1323.[12]

In analyzing the merits of plaintiffs' claims, the court applied the well-settled principle that "[a]n Eighth Amendment violation is comprised of both an objective component and a subjective component." *Id.* at 1298 (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). The objective component turns on whether the alleged

---

**10.** Exceptions to the maximum length of stay in an MHCB must be approved by "[t]he Chief Psychiatrist or designee." *Id.* at 12–5–1.

**11.** The exception is a relatively new program for female inmates operated by CDCR at California Institution for Women (CIW).

**12.** At the underlying trial the use of force claims centered on the use of tasers and 37mm guns. *See Coleman,* 912 F.Supp. at 1321–1323. The focus of the motion at bar is

on the use of OC pepper spray and expandable batons against class members. Plaintiffs' fundamental contention is the same: class members suffer from serious mental illnesses which are exacerbated by use of these weapons, use of the weapons causes serious harm, and defendants' current policies, both in design and implementation, continue to demonstrate deliberate indifference to their mental illnesses and the harms caused by use of the weapons.

deprivations are "sufficiently serious" to constitute the "'unnecessary and wanton infliction of pain'" proscribed by the Eighth Amendment. *Wilson,* 501 U.S. at 298, 111 S.Ct. 2321 (quoting *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). The findings in the preceding paragraph formed the objective component of the Eighth Amendment violations at issue.

 The subjective component of an Eighth Amendment violation requires a finding that the defendants have a "sufficiently culpable state of mind". *Wilson,* 501 U.S. at 298, 111 S.Ct. 2321 (citing *Rhodes* ). This requires the court "to assess whether the conduct at issue is 'wanton.'" *Coleman v. Wilson,* 912 F.Supp..at 1321 (quoting *Jordan v. Gardner,* 986 F.2d 1521, 1527 (9th Cir.1993))

> The "baseline" mental state for "wantonness" is "deliberate indifference." *Id.* As a general rule, the deliberate indifference standard applies where the claim is that conditions of confinement cause unnecessary suffering. *Id.* In contrast, the "malicious and sadistic" standard applies to claims arising out of

the use of force to maintain order. *See id.*

*Coleman v. Wilson,* 912 F.Supp. at 1321–22 (quoting *Jordan,* 986 F.2d at 1527–28). The Eighth Amendment violations at bar were all predicated on findings that defendants' policies and practices governing the use of force, punitive measures, administrative segregation and segregated housing constituted deliberate indifference to class members' serious mental illnesses and the serious and substantial harms to members of the plaintiff class caused by use of such measures. *See Coleman v. Wilson,* 912 F.Supp. at 1319–1323.[13]

Defendants now oppose plaintiffs' motion concerning use of force and disciplinary measures on the ground that there is no pattern and practice of malicious and sadistic use of force against mentally ill inmates. *See* Defs.' Opp'n to Motion Related to Use of Force and Disciplinary Measures, filed July 24, 2103 (ECF No. 4704) at 8. To some extent, this aspect of defendants' opposition may have been invited by some of the arguments advanced by plaintiffs in their motion.[14] Regardless, the question of whether defendants' policies and practices prevent or fail to pre-

---

**13.** The United States Court of Appeals for the Ninth Circuit has also applied the deliberate indifference standard to constitutional claims that prison staff used force, "including pepper spray, on prisoners instead of employing appropriate mental health interventions" and that the prison's general policies governing use of pepper spray were unconstitutional. *Hallett v. Morgan,* 296 F.3d 732, 744–45, 747 (9th Cir.2002). In *Hallett,* the court of appeals upheld the constitutionality of the challenged actions and policies based on findings that "use of pepper spray is carefully considered in advance of its authorization, restricted and confined for limited purposes, and used only very sparingly", staff was properly trained in its use and could not use it without being subjected to it. *Id.* at 747.

**14.** Plaintiffs' motion for additional orders concerning use of force proceeds from the

contention that members of the plaintiff class "are regularly and routinely subjected to unreasonable, unnecessary, and *excessive* uses of force by correctional officers in California prisons" and that "[t]he State's persistent use of unreasonable force against CDCR prisoners with mental illness causes grave harm to the *Coleman* class." Pls. Mot. for Enforcement of Court Orders and Affirmative Relief Related to Use of Force and Disciplinary Measures, filed May 29, 2013 (ECF No. 4638) at 10–11 (emphasis added). Plaintiffs also contend, *inter alia,* that defendants' policies and practices governing use of force are inadequate under every single criteria set forth by defendants' use of force expert's criteria for adequate systemic administration of force in a correctional setting. *Id.* at 11.

vent force applied maliciously and sadistically for the very purpose of causing harm, *see Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), is not before this court.[15]

■ First, application of that standard to the claims at bar was rejected by the court in 1995. While a different claim or changed circumstance might justify application of that standard, that appears not to be the case here. Accordingly, the law of the case doctrine applies to the instant motion. *See, e.g. Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983).

■ Second, as the court discussed in its order denying defendants' motion to terminate this action, once an Eighth Amendment violation is found and injunctive relief ordered, the focus shifts to remediation of the serious deprivations that formed the objective component of the identified Eighth Amendment violation. *See Coleman v. Brown,* 938 F.Supp.2d at 988. Remediation can be accomplished by compliance with targeted orders for relief or by establishing that the "violation has been remedied in another way." *Id.* To the extent the subjective component of an Eighth Amendment violation remains a relevant inquiry, it is coextensive with proof of ongoing objectively unconstitutional conditions. *Id.* at 989.

Defendants also argue that an assessment of whether defendants are subjectively deliberate indifferent should·include examination of whether the conduct or regulations at issue are "without penological justification" and that the factors outlined in *Turner v. Safley,* 482 U.S. 78, 107

S.Ct. 2254, 96 L.Ed.2d 64 (1987) "may be instructive in evaluating whether regulations challenged under the Eighth Amendment have a legitimate penological purpose." Defendants' Post–Evidentiary Hearing Brief, filed January 21, 2014 (ECF No. 4988) at 7. This argument misses the mark.

■ Violations of the Eighth Amendment are not excused by an asserted "reasonable relationship" to a legitimate penological goal. *See Johnson v. California,* 543 U.S. 499, 511, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005); *see also Jordan v. Gardner,* 986 F.2d 1521, 1530 (9th Cir.1993) (en banc). *Turner* applies where the constitutional right at issue is "one which is enjoyed by all persons, but the exercise of which may necessarily be limited due to the unique circumstances of imprisonment. . . . Eight Amendment rights do not conflict with incarceration; rather, they limit the hardships which may be inflicted upon the incarcerated as 'punishment.'" *Jordan,* 986 F.2d at 1530 (citing *Spain v. Procunier,* 600 F.2d 189, 193–94 (9th Cir.1979)). "[T]he integrity of the criminal justice system depends on full compliance with the Eighth Amendment." *Johnson,* 543 U.S. at 511, 125 S.Ct. 1141.

> Whatever rights one may lose at the prison gates, *cf. Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (prisoners have no right to unionize), the full protections of the eighth amendment most certainly remain in force. **The whole point of the amendment is to protect persons convicted of crimes. Eighth amendment protections are not for-**

---

**15.** Indeed, in the 1995 order on the merits of plaintiffs' claims the court specifically recognized that "[a]pplication of the deliberate indifference standard to this conditions of confinement case in no way precludes application of the malicious and sadistic standard in the context of suits brought by mentally ill inmates for physical or mental injuries sustained by virtue of the need to restore order in an emergency situation." *Coleman v. Wilson,* 912 F.Supp. at 1323 n. 60.

feited by one's prior acts. Mechanical deference to the findings of state prison officials in the context of the eighth amendment would reduce that provision to a nullity in precisely the context where it is most necessary. **The ultimate duty of the federal court to order that conditions of state confinement be altered where necessary to eliminate cruel and unusual punishments is well established.**

*Spain v. Procunier*, 600 F.2d at 193–94 (emphasis added).

 "The existence of a legitimate penological justification has, however, been used in considering whether adverse treatment is sufficiently gratuitous to constitute punishment for Eighth Amendment purposes." *Grenning v. Miller–Stout*, 739 F.3d 1235, 1240 (9th Cir.2014) (citing *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)) (in turn quoting *Gregg v. Georgia*, 428 U.S. 153, 183, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). Thus, the presence of a legitimate penological justification for conditions of confinement challenged under the Eighth Amendment may be considered in determining whether the challenged condition constitutes punishment prohibited by the Eighth Amendment. *See Grenning*, 739 F.3d at 1240 (discussing *Chappell v. Mandeville*, 706 F.3d 1052, 1058 (9th Cir.2013) and *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir.1996)). Nonetheless, in this case such consideration is necessarily delimited by the necessity of consideration of class members' mental status. The interrelationship of these two legitimate considerations is the crux of the problem considered herein.

 In sum, failure to properly consider the mental state of class members requires the court to act. If defendants fail to meet their Eighth Amendment obligations, this court must enforce compliance. *See Brown v. Plata*, — U.S. ——, 131 S.Ct. 1910, 1928, 179 L.Ed.2d 969 (2011) (citing *Hutto v. Finney*, 437 U.S. 678, 687, n. 9, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)). "Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown v. Plata*, 131 S.Ct. at 1928–29.

Finally, defendants assert that plaintiffs have the burden of proof on this motion. Plaintiffs do not dispute this assertion.

Given all the above, the court now turns to the motions at bar.

## I. *Use of Force/Disciplinary Measures*

### A. *Use of Force*

The Eighth Amendment violation with respect to use of force (hereafter "use of force" or "UOF") arises from policies and practices that permit use of force against seriously mentally ill prisoners without regard to (1) whether their behavior was caused by mental illness and (2) the substantial and known psychiatric harm and risks thereof caused by such applications of force. *See Coleman v. Wilson*, 912 F.Supp. at 1322. The record showed then, and still shows, that force can be and is used against seriously mentally ill inmates in circumstances that permit reflection prior to its application. *See id.*, 912 F.Supp. at 1321–23; *see also* Ex. A to Declaration of Michael D. Stainer, filed March 12, 2014 (ECF No. 5111–1).[16] Remediation of the identified Eighth Amendment violation concerning use of force against California's

---

**16.** Defendants have filed four declarations from Mr. Stainer, the Director of CDCR's Division of Adult Institutions in connection with these proceedings. Each will be referred to by its ECF number.

seriously mentally ill inmates requires at least three things: (1) development of policies and procedures which provide sufficient guidance and clarity to avoid the identified harm; (2) adequate implementation of those policies and practices, including but not limited to appropriate training of all staff; and (3) adequate enforcement of those policies and procedures. Whether ·the constitutional violation remains is a different question from the nature of further relief, if any, that may be required if the constitutional violation is ongoing.[17]

In addition to the legal principles set forth *supra*, two other principles guide the court's consideration of the issues at bar. First, there appears to be general agreement among the appellate courts that have considered the question that " 'it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary....' " *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir.1996) (quoting *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984)). "This is because, even when properly used, such weapons 'possess inherently dangerous characteristics capable of causing serious and perhaps irreparable injury to the victim.' " *Williams*, 77 F.3d at 763 (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir.1984), *cert. denied*, 470 U.S. 1035, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985)). Second, at least one appellate court has found that the Eighth Amendment is violated by use of pepper spray on a mentally ill inmate who, because of mental illness, is unable to comply with di-

rectives from prison officials and nonetheless is subjected to pepper spray. *See Thomas v. Bryant*, 614 F.3d 1288, 1310–11 (11th Cir.2010) ("repeated non-spontaneous use of chemical agents" on mentally ill inmate "constituted an extreme deprivation sufficient to satisfy the objective prong" of Eighth Amendment deliberate indifference claim where inmate's "well-documented history of mental illness and psychotic episodes rendered him unable to comply at the times he was sprayed such that the policy was 'unnecessary' and 'without penological justification in his specific case.' ") [18]

Taken together, the foregoing two lines of authority suggest that the Eighth Amendment requires clear and adequate constraints on the amount, if any, of pepper spray that may be used on mentally ill inmates generally and more particularly when such inmates are confined in a space such as a cell or a holding cage, as well as significant constraints, if not a total ban, on the use of pepper spray on mentally ill inmates who because of their mental illness are unable to comply with official directives.

The court now turns to the merits of plaintiffs' motion with respect to use of force.

Defendants' written UOF policy is found in Title 15 of the California Code of Regulations at §§ 3268–3268.3 and CDCR's Department Operations Manual Chapter 5, Article 2–Use of Force (DOM). Defs. Ex.

---

17. Put another way, the absence of a specific policy or practice requested by plaintiffs does not necessarily demonstrate that the constitutional violation is ongoing. On the other hand, one or more of the remedial orders requested by plaintiffs may be required if the constitutional violation has not yet been adequately remedied.

18. The *Williams* court applied the *Whitley* standard to the subjective component of the Eighth Amendment claim before that court, *see Williams*, 77 F.3d at 762, while the *Thomas* court applied the deliberate indifference standard. *See Thomas*, 614 F.3d at 1304–05. The relevance of both decisions to the analysis at bar are their holdings concerning the objective component of an Eighth Amendment violation arising from the use of pepper spray.

J, Stainer Decl., filed July 24, 2013 (ECF No. 4708) at ¶ 5. The current provisions of Title 15 were revised in August 2010 and implemented thereafter. Amended Declaration of John R. Day, filed August 26, 2013 (ECF No. 4772–1) at ¶ 4.[19]

DOM provisions governing UOF have been revised twice since the conclusion of the evidentiary hearing.[20] *See* Stainer Decls. (ECF Nos. 4987, 5078, 5111–1). While defendants dispute plaintiffs' characterization of the uses of force depicted on six videotapes shown at the hearing, several of the DOM revisions appear directly aimed at preventing such uses of force. At the hearing, Michael Stainer, the Director of CDCR's Division of Adult Institutions testified that none of the uses of force depicted in the six videotapes constituted excessive force "as defined by [CDCR] policy." Reporter's Transcript Re: Evidentiary Hearing (RT) at 911:23–912:1. He further testified that in his view while none of the videos depicted excessive force "there might have been better ways of doing things, but that is tactics. . . . [W]e plan on addressing that with our policy revisions which provide additional guidance." RT at 912:2–7.

The court accepts Mr. Stainer's testimony that none of the force depicted on the six videotapes was excessive under then-existing guidelines in CDCR policy. In combination with the events depicted on the videotapes, that testimony is perhaps the best evidence that the constitutional violation with respect to use of force on seriously mentally ill inmates has not yet been remedied.

The court cannot credit Mr. Stainer's testimony that what was depicted on the six videos shown at the hearing depicted acceptable "tactics." Most of the videos were horrific; each was illustrative of one or more of the objective components of the underlying constitutional violation found in the court's 1995 order. Defendants' expert, Steve Martin, testified that the fact that the events depicted on the videotapes "occurred is bad enough, and, hopefully, they're as few in number, as I believe them to be, . . . But what is so bothersome and disturbing is that no—this sophisticated IERC (Institutional Executive Review Committee) with all these ranking administrators experienced as Director Stainer is, could read these reports and not at least question the amount of spray or the

---

**19.** The current regulations were promulgated and implemented pursuant to a review process required by another federal class action lawsuit, *Madrid v. Gomez*, No. 90–3094 TEH (N.D.Cal.). Defendants contend, *inter alia*, that plaintiffs' motion is, in part, an improper effort to seek reconsideration of the *Madrid* court's order. *See* Defs.' Opp. To Motion Related to Use of Force and Disciplinary Measures, filed July 24, 2013 (ECF No. 4704) at 33 n. 6. The motion at bar is focused on whether defendants' use of force policies and practices are sufficient to remedy the constitutional violation identified by this court in its 1995 order. That issue was not before the *Madrid* court.

**20.** One of plaintiffs' objections to the revised DOM provisions is that the new procedures are only in the DOM and not in Title 15. Plaintiffs contend that state law requires

"CDCR rules of general (statewide) application to prisoners be formally promulgated and added to Title 15" and they question whether DOM provisions only, without alterations to Title 15, are sufficient for a durable remedy. *See* Pls. Brf. on Defs. Proposed Revisions to Use of Force Policy, filed February 12, 2014 (ECF No. 5065) at 11 n. 3. Although this question is not before the court, it appears that the state law requirement that agency rules of general application be promulgated in accordance with the requirements of California's Administrative Procedures Act does not mean that all CDCR rules of general application must be added by amendment to Title 15. *See Morales v. California Department of Corrections and Rehabilitation*, 168 Cal.App.4th 729, 735–36, 85 Cal.Rptr.3d 724 (2008).

tactics used...." RT at 1903:9–17. Mr. Martin testified that without such questioning, neither review nor corrective action occurs and the absence of corrective action is "the path to institutionalizing a culture that lends itself to harm, to institutionalized harm." RT at 1903:22–1905:18.

Even if the incidents on the videotapes were, as Mr. Martin testified, "isolated aberrations, anomalies, outliers" that "do not ... represent the vast majority of incidents" he reviewed, RT at 1795:3–8, Mr. Stainer's testimony establishes that all of the incidents fell within the purview of defendants' UOF policy. Furthermore, both Mr. Martin and Mr. Stainer testified that none resulted in further review beyond the IERC or, except for some "trainings", corrective action independent of these proceedings. RT at 954:6–17 (Stainer); RT at 1901:16–1903:12 (Martin). This, in itself, demonstrates the constitutional inadequacy of either the regulations or the review process.

In addition, plaintiffs' evidence suggests that force is used against mentally ill inmates at a rate greatly disproportionate to their presence in the overall inmate population. Plaintiffs' expert, Eldon Vail, reported that twelve of California's prisons reported use of force incidents against mentally ill inmates at a rate more than double their representation in the prison population, three prisons reported use of force incidents against mentally ill inmates at a rate triple their representation in the prison population, and in several, 87 to 94% of the use of force incidents were against mentally ill inmates. Expert Declaration of Eldon Vail, filed May 29, 2013 (ECF No. 4638–1) at ¶¶ 9–11. As Mr. Vail opined, this is evidence, at least, of a systemic failure to understand "what a mentally ill person might be experiencing before or during a use of force incident, or of how mental illness may make it difficult for an inmate to immediately conform his or her behavior in response to an order." *Id.* at ¶ 12.

Mr. Stainer also testified to the need for revisions to the policy to guide staff in making "appropriate" UOF decisions and that the UOF guidelines would be "tighten[ed] down ... quite a bit." RT at 826:16–25. The policy revisions are a critical step forward and, if fully implemented and enforced, will bring the state closer to remediation of the identified Eighth Amendment violation. Without more, however, seriously mentally ill inmates in California's prisons will remain subject to uses of force by custody staff armed with OC pepper spray and expandable batons "without regard to the impact of those weapons on their psychiatric condition." *Coleman v. Wilson,* 912 F.Supp. at 1323.

Title 15 and the DOM divide use of force incidents into two categories: immediate and controlled. "Immediate use of force" is "[t]he force used to respond without delay to a situation or circumstance that constitutes an imminent threat to the security or the safety of persons." 15 C.C.R. § 3268(a)(4); *see also* DOM § 51020.4. "Controlled use of force" is defined as "[t]he force used in an institution/facility setting when an inmate's presence or conduct poses a threat to safety or security and the inmate is located in an area that can be controlled or isolated." 15 C.C.R. § 3268(a)(5); *see also* DOM § 51020.4. The DOM provisions expand on the regulations by providing that immediate uses of force may be used by employees without prior authorization, while controlled uses of force require authorization and presence of specific personnel. *See* DOM § 51020.4.

The differences between these two categories are significant to the remedy in this case. "Immediate" uses of force are applied without the reflection and intervention that can avoid or prevent the serious

harm suffered by members of the plaintiff class when force is used. *See* RT at 1967:6–12. Thus, the definition of immediate use of force must be adequate to exclude uses of force in circumstances where "time, distance and delay" can be taken before force is used. *See* RT at 1966:17–1968:4 (testimony of Steven Martin that if an officer could have "waited and taken time, distance and delay" instead of immediately using force "the force obviously was not necessary.")

Plaintiffs' expert, Eldon Vail, testified that the appropriate criteria for immediate use of force is already in California's use of force policy, which on its face requires an "imminent threat" to justify an immediate use of force. RT at 436:7–8, 436:24–473:3; *see also* RT at 1935:11–14 (testimony of defense expert Steven Martin that "immediate use of force is supposed to be used only if there's some imminent harm that needs to be stopped.") Mr. Vail's principal critique of the written policy was a then-existing exception in § 51020.11.2 of the DOM which allowed immediate use of force against inmates who refused to relinquish their food ports. *See* Ex. A to Stainer Decl. (ECF No. 4708–1) at 5. Mr. Vail testified that was a "really huge flaw" in defendants' use of force policy. RT at 553:5–554:4. Newly amended § 51020.11.2 has removed that exception and no longer authorizes immediate use of force when an inmate refuses to relinquish a food port. Instead, "[i]n the event the inmate does not relinquish control of the food port, the officer shall back away from the cell and contact and advise the custody supervisor of the situation. Controlled force will be initiated while custody staff continue to monitor the inmate." Ex. A to Stainer Decl. (ECF No. 5111–1) at 9.

Mr. Stainer averred that the revisions to the DOM concerning the food ports were made "to emphasize CDCR's policy that the immediate use of pepper spray is only authorized in response to an emergent or imminent threat." Stainer Decl. (ECF No. 5111–1) at ¶ 3. As revised, defendants' current written policy concerning immediate use of force appears to be adequate on its face. However, testimony at the hearing and the nature of the revisions to the DOM highlight both the importance of adequate training in the revisions to the policy and the necessity of monitoring immediate uses of force to ensure that they are limited to "imminent threats."

The record before the court suggests that for an extended period of time CDCR staff have been working with a broad definition of "imminent threat." In addition to the food/security port exception, there was evidence at the hearing that immediate use of force was authorized by policy when, even without an imminent threat, inmates kicked their cell doors. RT at 436:5–9. Defendants' expert Steve Martin testified that "[t]here are substantially more use of force incidents [in CDCR] that are immediate and not controlled." RT at 1966:9–13. He testified concerning a high percentage of immediate use of force incidents at Pelican Bay in the period from January to October 2012. RT at 1935:18–1937:3. He reviewed 180 incidents of use of force, 174 of which had been characterized as " 'immediate applications of force.' " RT at 1935:15–1936:9. In reviewing those incidents, he "identified fairly quickly a number of incidents" categorized as "immediate" uses of force that evidence showed "could have been managed through 'controlled force.' RT at 1936:17–19. Those incidents evidenced unnecessary uses of force. *See* RT at 1967:17–1968:4 ("immediate" use of force where "controlled use of force" was possible demonstrates unnecessary use of force "because if you could have waited and taken time, distance and

delay, the force obviously was not necessary.")[21]

The foregoing suggests that heretofore immediate use of force has been used with far greater frequency than authorized by the written policy testified to by Mr. Stainer. It will be necessary going forward for defendants to provide adequate staff training and to closely monitor *all* UOF incidents, particularly those classified as "immediate" uses of force, to ensure that these policy revisions are actually effected.

The issues with respect to controlled use of force are different. They concern (1) whether defendants obtain the relevant information concerning an inmate's mental illness prior to application of force; and (2) what is done with the information that is obtained.

Section 51020.4 of the DOM defines controlled use of force as

> the force used in an institution/facility setting, when an inmate's presence or conduct poses a threat to safety or security and the inmate is located in an area that can be controlled or isolated. These situations do not normally involve the immediate threat to loss of life or immediate threat to institution security. All controlled use of force situations require the authorization and the presence of a First or Second Level Manager, or Administrative Officer of the Day (AOD) during non-business hours. Staff shall make every effort to identify disabilities, to include mental health concerns, and note any accommodations that may need to be considered.

Ex. A to Stainer Decl. (ECF No. 5111–1) at 6. In addition to the definitional provision, several other DOM provisions are relevant to the issues before the court.

The use of force options available to CDCR officers are set forth in DOM § 51020.5. That section provides:

> Use of Force options do not have to be utilized in any particular sequence, but should be the force option staff reasonably believes is sufficient. Verbal persuasion or orders should be issued prior to resorting to force and are required to be provided before controlled force is used.... Use of force options include but are not limited to:
>
> - Chemical agents
>
> - Hand-held batons
>
> - Physical strength and holds. A choke hold or any other physical restraint which prevents the person from swallowing or breathing shall not be used unless the use of deadly force would be authorized.
>
> - Less-lethal weapons. A less lethal weapon is any weapon that is not likely to cause death. A 37mm or 40mm launcher and any other weapon used to fire less lethal projectiles is a less lethal weapon.
>
> - Lethal weapons. A firearm is a lethal weapon because it is used to fire lethal projectiles. A lethal weapon is any weapon that is likely to result in death.

---

21. Subsequently, in response to a question about whether there is a "pattern and practice of systemic use of force at Pelican Bay," Mr. Martin testified that "probably, if memory serves..., I found three to five cases out of the immediate category case that I believed could have been calculated applications of force." RT at 1968:10–15. Given Mr. Martin's other testimony about that the "very high percentage" of immediate use of force incidents at Pelican Bay, and the fact that he brought this information to the attention of the current Secretary of Corrections, who was with him at Pelican Bay, the court places substantial weight on Mr. Martin's testimony that the disproportionate number of immediate use of force incidents at Pelican Bay was not de minimis and was cause for concern.

Ex. A to Stainer Decl. (ECF No. 4708–1), at 3.

DOM section 51020.12 sets forth the general requirements for controlled use of force. Ex. A to Stainer Decl. (ECF No. 5111–1) at 9–10. It requires that mental health concerns "be taken into account prior to any controlled use of force." *Id.* at 10. It also requires that all controlled uses of force

be preceded by a cool down period of reasonable length to allow the inmate an opportunity to comply with staff orders. During the cool down period, clinical intervention by a licensed practitioner shall be attempted, regardless of the mental health status of the inmate. The length of the cool down period can vary depending upon the circumstances. In situations involving participants in the mental health program, Incident Commanders, on-site Managers, and licensed health care practitioner shall discuss concerns that may affect the length of the cool down period.

The First or Second Level Manager, or the AOD, shall determine the length of the cool down period and communicate this to the Incident Commander....

A controlled use of force shall not be accomplished without the presence of a licensed health care practitioner.

*Id.* at 10.

Controlled uses of force must be video recorded. *See id.,* DOM § 51020.12.1. DOM § 51020.12.1 vests the Incident Commander with the responsibility for "determining what force options shall be used and the order in which they will be applied." Ex. A to Stainer Decl. (ECF No. 5111–1) at 11. The Incident Commander is required to "consider", *inter alia,* the inmate's "apparent mental state" when determining those force options. *Id.* The First or Second Level Manager/AOD must "identify themselves on camera and con-

firm they are authorizing the controlled use of force, including the force options as stated by the Incident Commander." *Id.* The attempted clinical intervention, which is described as "efforts made to verbally counsel the inmate and persuade the inmate to voluntarily come out of the area without force" is to be recounted on camera by the licensed health care practitioner who attempted the intervention; the actual intervention is not recorded. *Id.*

DOM § 51020.12.2 contains specific provisions for controlled uses of force involving seriously mentally inmates, as follows:

When inmates are housed in departmental hospitals, infirmaries, Correctional Treatment Centers (CTC), Enhanced Outpatient Program Units (EOP), or Psychiatric Services Units (PSU), or has an EOP level of care designation, or any inmate who is acting in a bizarre, unusual, uncharacteristic manner, the controlled use of force shall occur as follows:

- A licensed health care practitioner designated by the Chief Executive Officer (CEO) shall be consulted prior to the use of chemical agents (see Chemical Agents Restrictions).

- Clinical intervention by a licensed practitioner shall be attempted. Clinical intervention shall also precede the extraction of any inmate who is being extracted upon the written order of a medical doctor, psychiatrist, or psychologist to facilitate a change in housing for treatment purposes.

- The clinician shall attempt to verbally counsel the inmate and persuade the inmate to voluntarily come out of the area without force. These efforts shall continue during the cool down period.

- Whenever circumstances permit, the clinician shall be a mental health provider; i.e., Psychiatric Technician, Licensed Clinical Social Worker, Psychologist, or Psychiatrist.

*Id.* at 12. Former DOM § 51020.12.2 was substantially similar; the amendment adds language extending its provisions to "any inmate who is acting in a bizarre, unusual, uncharacteristic manner." *See* Ex. A to Stainer Decl. (ECF No. 5078–1) at 8. The provisions of DOM § 51020.12.2 are "additional safeguards and requirements" to be followed for controlled UOF on mentally ill inmates; the other provisions of the UOF policy also continue to apply. RT at 806:17–807:24.

The amendments to the DOM change in significant ways the amount of pepper spray authorized in controlled UOF incidents. Amended DOM § 51020.15 lists the specific types of pepper spray authorized for use, the number of applications, and the duration of each application. Ex. A to Stainer Decl. (ECF No. 5111–1) at 14–15. Staff must wait a minimum of three minutes after an application of pepper spray before applying another application, and the Incident Commander and Response Supervisor must assess the effectiveness of each application. *Id.* at 15. No more than four applications of pepper spray are permitted, except that "[i]n exigent or unusual circumstances it may be necessary to exceed the 4 allowed applications." *Id.* Additional applications must be specifically authorized by the First or Second Level Manager/AOD, and each must be explained on the video recording. *Id.* The Incident Commander and the Response Supervisor are required to consult with each other and "consider. the totality of circumstances to determine the best course of action." *Id.* Additional consultation is required for mentally ill inmates:

If the inmate is a participant in the mental health program and has not responded to staff for an extended period of time, including during the cool down period, laying motionless on bunk or floor, sitting on edge of bunk head down, no eye contact, and it appears that the inmate does not present an imminent physical threat, additional consideration and evaluation should occur before the use of chemical agents is authorized. This additional evaluation should include input from the assigned housing unit staff and licensed health care practitioners regarding the inmates recent behavior, file review for recent history of violence, previous cell extractions, etc. The rationale shall be explained on camera by the on-site Manager.

*Id.*

Amended DOM § 51020.15.1 limits the OC products that can be used in "one/two person celled housing, single person expanded metal holding cells, showers, or any other small space." Ex. A to Stainer Decl. (ECF No. 5111–1) at 16. In addition, this section contains specific language governing use of pepper spray in controlled use of force incidents involving mentally ill inmates at the EOP level of care or higher:

For controlled use of force incidents involving inmates housed in departmental hospitals, infirmaries, CTCs, EOPs, and PSUs, or who have an EOP level of care designation, a licensed health care employee designated by the Chief Executive Officer (CEO) shall be consulted prior to the use of chemical agents:

- The licensed health care practitioners shall document his/her recommendation regarding whether or not there is a contraindication for the use of chemical agents on a Medical Chrono (CDC 128C).

This document shall be included in the incident package.

- If, during the 'consultation, the licensed health care practitioners express concerns regarding the use of chemical agents, the First/Second Level Manager authorizing the use of force and licensed health care practitioners shall discuss the matter to determine the best course of action. The licensed health care practitioner shall consider in providing their consultation, the potential for injury during the use of physical force, as well as the medical implication of exposure to chemical agents. After the consultation, the decision to use chemical agents or physical force shall rest with the First or Second Level Manager authorizing the use of force.

- If a decision is made to use chemical agents in spite of any contraindications, the decision shall be articulated and written justification provided. The written justification must include specific determinations and considerations to justify the need to over-ride the contraindications, beyond the statement of safety to staff or security of the institution. Consideration shall be given to the inmate's mental health status and current mental state.

*Id.* at 16. Unlike amended DOM § 51020.12.2, the provisions of this section do not extend to "any inmate who is acting in a bizarre, unusual, uncharacteristic manner." *See id.*

In addition, the amended provisions stand in contradistinction to DOM § 51020.14.1, which prohibits the use of less lethal weapons on seriously mentally ill inmates "housed in departmental hospitals, infirmaries, or other CDCR medical facilities, or who have an EOP level of care designation" in controlled use of force incidents unless authorized by the Institution Head, Chief Deputy Warden, or AOD and "[c]ircumstances [are] serious in nature calling for extreme measures to protect staff or inmates, i.e., the inmate may be armed with a deadly weapon." Ex. A to Stainer Decl. (ECF No. 4708–1) at 6.

Once again, the DOM revisions concerning controlled use of force evidence an effort to heighten consideration of the impact of UOF measures on mentally ill inmates. Nonetheless, it appears to the court that the measures do not meet Eighth Amendment standards.

First, defendants' policy concerning controlled use of force on the seriously mentally ill inmate fails to require consideration of the inmate's ability to conform his or her conduct to the order or directive giving rise to the use of force. Defendants' expert, Steve Martin, testified that "without qualification" the inmate's ability to comply with orders must be considered if policy permits use of force for disobedience with an order, and that it is not appropriate to use of pepper spray to obtain compliance with orders a seriously mentally ill inmate cannot and does not understand. RT at 1871:14–25, 1872:6–24. This factor must be considered. *Cf. Thomas v. Bryant*, 614 F.3d at 1311.

Second, the policy revisions do not vest mental health clinicians with sufficient authority in decisions concerning use of force. In every instance, final decision-making responsibility and authority for all uses of force rest with custodial staff. While consultation with mental health staff is required, custody staff is authorized to override clinical judgments without sufficient guidance about which clinical judgments, if any, may be overridden and under what circumstances. *Cf. Gates v.*

*Gomez*, 60 F.3d 525, 533 (9th Cir.1995) (interpreting consent decree; "since CMF is a prison health care facility, no custody decision should be made that is medically contraindicated.")

Mr. Stainer is to be commended for the steps he has taken to "tighten down" the use of force guidelines for use of force against members of the plaintiff class. The fact that additional work remains does not take away from the court's recognition that Mr. Stainer appears to have taken his responsibility in this area seriously. The court anticipates that with continued diligence, full remediation can be achieved.

Defendants must complete the work begun by Mr. Stainer so that their policies and practices relative to use of force on seriously mentally ill inmates include (1) consideration of the role of mental illness in an inmate's ability to comply with staff directives; (2) adequate guidance concerning the role of mental health clinical judgments in use of force on class members and when, if ever, those judgments may be overridden by custody staff; and (3) alternatives to use of force on seriously mentally ill inmates where there is no imminent threat to life and force is contraindicated by the inmate-patient's mental health.[22]

Plaintiffs also challenge the use of the expandable baton on class members. Both plaintiffs' expert, Mr. Vail, and defendants' expert, Mr. Martin, agreed that the expandable baton is an impact weapon whose primary function is self-defense. *See* Vail Decl. (ECF No. 4638–1) at ¶¶ 31–32; Ex. 1 to Declaration of Lori E. Rifkin (ECF No. 4638–8) at 8. At the time of the hearing, the court heard testimony that the expandable baton is worn by California correctional officers as "standard issue" on their duty belts. RT at 88:18–23 (Vail); RT at

1811:5–9. Defendants' expert testified that there is not "sufficient guidance in either the regs or training materials" concerning the use of these batons. RT at 1812:17–19.

Although it is not clear, it appears that defendants' revised use of force policy may have changed the practice of standard issuance of expandable batons. *See* Ex. A to Stainer Decl. (ECF No. 5111–1) at 12 (DOM § 51020.12.3 including expandable baton in list of extraction equipment to "be issued" if extraction is necessary). Defendants will be directed to clarify this.

Defendants shall work under the guidance of the Special Master to make the additional revisions to the use of force policy and the clarifications and guidance concerning the use of the expandable baton required by this order. The Special Master, shall provide expertise where necessary, and shall ensure that plaintiffs are provided notice and an opportunity for input as appropriate. The revisions shall be completed within sixty days.

### B. *Disciplinary Measures*

Plaintiffs also contend that further remedial orders are required to remedy the identified constitutional violation in defendants' use of disciplinary measures against mentally ill inmates. The constitutional violation was based in a finding that seriously mentally ill inmates " 'who act out are typically treated with punitive measure without regard to their mental status.' " *Coleman v. Wilson*, 912 F.Supp. at 1320. The court found "substantial evidence in the record of seriously mentally ill inmates being treated with punitive measure by the custody staff to control the inmates' behavior without regard to the cause of the

---

**22.** It appears to the court that the seeds of the solution to at least some of the foregoing are in the Program Guide and those DOM provi-sions that provide specific restrictions for use of force on inmate-patients at EOP and higher levels of care. *See, e.g.,* DOM § 51020.14.1.

behavior, the efficacy of such measures, or the impact of those measures on the inmates' mental illnesses." *Id.*

In 1995, the violation was attributed in substantial part to inadequate training of custody staff in the signs and symptoms of mental illness. *Id.* During the remedial phase of this action, defendants have developed a mental health assessment process for prison disciplinary proceedings involving most seriously mentally ill inmates. By September 2001, defendants had completed a final draft of a policy that required a mental health assessment of all EOP and MHCB inmates charged with rules violations "to determine if the behavior of the inmate resulting in the rule violation was influenced by a mental disorder." Ex. 3 to Declaration of Jane E. Kahn, filed May 29, 2013 (ECF No. 4640) at 34.

Formulation of policy for mental health assessment of CCCMS inmates charged with rules violations has proceeded more slowly. *See* Seventeenth Monitoring Report of the Special Master, Part B, filed April 2, 2007 (ECF No. 2180–1) at 44–47; Twenty–Third Round Monitoring Report of the Special Master, filed December 1, 2011 (ECF No. 4124) at 31–39. The relevant history is set forth in the Special Master's Twenty–Third Round Monitoring Report. *See* Twenty–Third Round Monitoring Report (ECF No. 4124) at 31–39; *see also* Kahn Decl.(ECF No. 4640) at ¶¶ 19–20 (citing Twenty–Third Round Monitoring Report).

In August 2007, defendants were ordered to develop and plan "for identifying and developing changes necessary to broaden the impact of the then-existing mental health assessment process in CDCR prison disciplinary matters for 3CMS inmates." Twenty–Third Round Monitoring Report (ECF No. 4124) at 31–32. Initially defendants submitted a re-

vised plan to the Special Master on May 1, 2008, with several representations, including completion of a pilot by August 5, 2008, and a representation that by November 1, 2008 they would "develop an implementation plan that includes a procedure for effective monitoring of the RVR process." *Id.* at 34. However, defendants submitted nothing further to the Special Master for over three years after the May 2008 report. *Id.*

In June 2011, after repeated requests from the Special Master, defendants produced a report on the pilot which showed that key elements had never been implemented or piloted. *Id.* at 35–36. Moreover, the June 2011 report "concluded with a list of five actions for statewide application that bore very little resemblance to" the May 2008 plan and "signalled too much of a retreat for the original assessment process of 1998, when a mental health evaluation was required for every *Coleman* caseload inmate who received an RVR." *Id.* The Special Master reported that

> [i]t appeared that defendants had lost sight of the original identified problem and the goal of the pilot to resolve that problem. Given the limited character of what defendants proposed as their plan, appropriate use of the mental health assessments in the disciplinary process for 3CMS inmates may well have ended up being even more limited than it was before the plan was ordered.

*Id.* at 38.

 On May 10, 2011, defendants circulated a new field memorandum directing completion of mental health assessments for 3CMS inmates charged with the most serious disciplinary infractions. *Id.* Thereafter, the Special Master and the parties had a "handful of meetings in September and October 2011" which resulted in an agreement between the parties and approved by the Special Master for a newly

revised policy for mental health assessments for CCCMS inmates charged with rules violations. *Id.* at 38–39. In October 2011, defendants distributed a training plan. *Id.* At the time of the writing of the Twenty–Third Round Monitoring Report, the parties and the Special Master had agreed "that the training portion of the plan will be updated with regard to the definition and extent of the penalty-mitigation envisioned by the plan," that "CDCR staff will verify that the training is consistent with existing applicable Program Guide provisions," and that implementation and operation of the plan would "then be reviewed in the course of regular *Coleman* monitoring activities." *Id.*

At the hearing, plaintiff's expert Eldon Vail testified that CDCR's prison disciplinary process does not "systematically take[ ] into account the mental illness of inmates in their system, and the result is that inmates are often punished for their mental illness." RT at 464:21–465:2. Mr. Vail's opinion in this regard is based on, *inter alia,* review of "more than 268 RVR reports," all of defendants' expert's file for the termination proceedings, and CDCR's RVR policies and procedures. Expert Declaration of Eldon Vail in Support of Reply Brief, filed August 23, 2013 (ECF No. 4766–2) at ¶ 2. Mr. Vail also testified that although defendants have policies and procedures designed to account for the role of mental illness in rules violations, defendants do not capture sufficient "aggregate data" to assess whether these policies and procedures are in fact working. RT at 465:3–12. He testified that during his review he "looked at lots of examples, individual examples, granular examples" where they were not working. RT at 465:13–15.

The testimony of defendant's expert Steve Martin in this regard was similar. Mr. Martin testified that he reviewed over 400 rules violation reports issued to inmates who refused orders to cuff up and were subsequently charged with obstructing or disobeying a peace officer and, where they were completed, the mental health assessment forms completed as part of the RVR process. RT at 1943:1–1944:19. He found that sometimes clinicians did a good job of explaining whether the inmate's mental illness caused or contributed to the incident and sometimes they did not. RT at 1944:20–1945:4. He also found "varying levels of communication between the clinical staff and custody as to how that mental health assessment process was working," with R.J. Donovan standing alone in the quality of communication between clinical and custodial staff in the rules violation process. RT at 1947:6–20. He testified that it was difficult to monitor what, if any, role the mental health assessment plays in the rules violation process. RT at 1948:2–16. He also testified that he rarely, if ever, found diversion of mentally ill inmates from sanctions even though in his opinion that "should happen" at least sometimes if the information on the form is properly gathered and used. RT at 1951:14–1952:8.[23]

Based on the foregoing, the issue relative to the disciplinary process turns on the adequacy of defendants' implementation of the plan agreed to by the parties and approved by the Special Master in

---

**23.** The testimony at the evidentiary hearing was consistent with the uneven implementation of the RVR mental health assessment policy reported by the Special Master in his Twenty–Fourth and Twenty–Fifth Round Monitoring Reports. *See* Twenty–Fourth Round Monitoring Report (ECF No. 4205) at 87, 98, 108, 120, 142, 155, 164, 180–81, 197–98, 208, 220–221, 232; Twenty–Fifth Round Monitoring Report (ECF No. 4298) at 98–99, 104, 114, 125, 128, 139–40, 145, 159, 169, 193, 202, 219, 231, 242, 252, 267, 275, 288, 300, 310, 323–24, 336, 346, 357, 365, 376, 382, 386, 389, 393, 399, 414, 424.

2011. Accordingly, the court will direct the Special Master to report to the court within six months whether defendants have adequately implemented the RVR policies and procedures agreed to in 2011.

At the hearing, the court also received evidence of a practice referred to as "Management Status." Director Stainer testified that "management status" was then part of local operating procedures at a majority of, but not all, prison institutions. RT at 887:7–12. He testified that it differed from the rule violation process because it was not imposed as part of the disciplinary process but is an alternative sanction imposed as an "indirect response to a set of threatening behaviors to stop those behaviors from continuing." RT at 889:15–21. He also testified that his office had received local operational procedures for management status from every prison that "has this process in their local operating procedure" and was "in the process of reviewing it for consistencies." RT at 888:6–14. His office was "going to come out with a formatted operational procedure for each institution to, again, fill in only site specific issues so we have a consistent application of those processes, making sure that appropriate due processes are in place for the inmates, and checks and balances for the application for these precautions in the management cell status" and to avoid "arbitrary placement of an individual on these type of sanctions." RT at 888:13–20, 891:2–3.[24]

Defendants will be directed to work with the Special Master on a timeline for completion of the review process testified to by Mr. Stainer so that defendants' use of management status can be reviewed by the Special Master as part of his review of the implementation of defendants' RVR policies and procedures.

## II. *Segregated Housing*

By their May 6, 2013 motion, plaintiffs seek additional remedial orders related to housing of seriously mentally ill inmates in administrative segregation and segregated housing units. Serious issues concerning placement of class members in administrative segregation and segregated housing units have plagued this litigation since its inception.

In 1995, the court found that defendants were violating the Eighth Amendment in housing mentally ill inmates in " 'administrative segregation and segregated housing at Pelican Bay SHU and statewide ... because mentally ill inmates are placed in administrative segregation and segregated housing without any evaluation of their mental status, because such placement will cause further decompensation, and because inmates are denied access to necessary mental health care while they are housed in administrative segregation and/or segregated housing.' " *Coleman v. Wilson*, 912 F.Supp. at 1320 (internal citation omitted).

As recently as last year, it was evident that the constitutional violation had not been remedied. In the April 2013 order denying defendants' termination motion, the court specifically identified the need to address "ongoing issues related to placement of EOP (Enhanced Outpatient) inmates in administrative segregation, particularly those housed in such units for over 90 days" as a " 'critically important' goal[ ] ... necessary to remedy the Eighth

---

**24.** During the proceedings on plaintiffs' motion concerning segregated housing, the court also heard testimony about the use of management cells in administrative segregation units. Plaintiffs' expert, Dr. Haney, described them as "punishment cells" and he testified that he interviewed class members inside these cells but could not find any standards for their use in Title 15. RT at 2186:18–2187:25.

Amendment violation in this action." *Coleman v. Brown*, 938 F.Supp.2d at 969 (internal citation omitted). Specifically, the court found this "critical goal"

> centers on treatment of mentally ill inmates in administrative segregation, particularly those whose stays in these units exceed ninety days and those who are placed in administrative segregation for non-disciplinary reasons. These inmates face substantial risk of serious harm, including exacerbation of mental illness and potential increase in suicide risk. *See* Twenty–Fifth Round (ECF No. 4298) at 36. The evidence before the court shows that a disproportionate number of inmate suicides occur in administrative segregation units. Remedial efforts over the past six years have focused on reducing the length of time EOP inmates remain in administrative segregation and providing appropriate clinical care for EOP inmates housed in such units. *See id.* at 34–35.

In their motion, defendants contend that they have "developed and implemented procedures for placing and retaining inmates with mental health needs in any administrative segregation or security housing unit." Termination Motion (ECF No. 4275–1) at 29. Defendants contend that while mentally ill inmates are in these units their mental health needs are "being appropriately met" and that there is no evidence to the contrary. *Id.* This contention is not supported by defendants' own experts.

Defendants' experts describe the "environment of administrative segregation" as "generally non-therapeutic." Clinical Exp. Rpt. (ECF No. 4275–5) at 20. They recommend that housing inmates with serious mental disorders be "as brief as possible and as rare as possible." *Id.* at 25.FN41 Defendants' experts noted the "statistical overrepresentation of completed suicides" in administrative segregation units when compared to other housing units, accordingly, recommend that "placement of inmates who require an EOP level of care be housed in Administrative Segregation Units only when absolutely necessary for the safety of staff or other inmates, and only for as long as it absolutely necessary." *Id.* at 23. They also reported finding, at two prisons, "some inmates waiting for EOP Special Needs Yard beds and reportedly housed in an Administrative Segregation Unit for their own protection; not because they posed a danger to others." *Id.* at 21.FN42 They recommended that such inmates be "placed in the front of any waiting list." *Id.*

---

FN41. They also "applaud CDCR's efforts to expedite the transfer of EOP inmates out of administrative segregation" but they don't describe what those efforts are. *Id.* at 20.

FN42. Defendants' experts describe a single case at California Medical Facility (CMF) as having "no systemic implications" but they reiterate their recommendation that such inmates be "moved to the top of the transfer list." *Id.* at 24.

In the Twenty–Fifth Round Report, the Special Master reported an ongoing need for improvement in treatment provided to inmates needing an Enhanced Outpatient (EOP) level of care who are placed into administrative segregation units. *See* Twenty–Fifth Round Report (ECF No. 4298) at 34–38. The Special Master reports an "elevated proportion of inmates in administrative segregation who are mentally ill" and describes a series of issues to be addressed, including

> reduction of risks of decompensation and/or suicide, alternatives to use of administrative segregation placements for non-disciplinary reasons, access to treatment/mitigation of harshness of

conditions in the administrative segregation units, suicide prevention, and reduction of lengths of stay in administrative segregation.

*Id.* at 38. The Special Master's findings identify remaining issues that are also identified by defendants' experts. These issues, until remedied, mean that seriously mentally ill inmates placed in administrative segregation units continued to face a substantial risk of harm. *Id.* at 979–980.[25] The principal question before the court is whether there have been sufficient changes in defendants' present policies and practices over the past year to cure the identified systemic constitutional violations and, if not, whether additional remedies are necessary.[26]

Defendants oppose plaintiffs' motion in part by contesting the evidence and opinions of plaintiffs' expert, Dr. Craig Haney, concerning the harmful effects of segregated housing on certain mentally ill inmates. Defendants contend that "Dr. Haney's opinions are derived from studies that do not stand up to modern scientific scrutiny." Defs. Opp. to Pls.' Mot. Related to Housing and Treatment of Mentally Ill Inmates

in Segregation, filed July 24, 2013 (ECF No. 4712), at 12. Defendants tendered their own expert, Dr. Charles Scott, who summarized "various longitudinal studies" and avers that those studies "indicate that segregation does not cause the type and severity of psychological harm previously described in descriptive studies." Declaration of Charles Scott, M.D., filed July 24, 2013 (ECF No. 4715) at ¶ 28. At the hearing, Dr. Scott testified concerning two of those studies, the only two studies he relied on, the so-called Zinger study published in the Canadian Journal of Criminology in January 2001 and the so-called O'Keefe study published in 2013 in the Journal of the American Academy of Psychiatry Law. *See* Exs. 1 and 2 to Defs. Ex. WWW.

The court is not persuaded by the conclusions Dr. Scott draws from those studies. First, both studies expressly reject extrapolation of their findings to other jurisdictions. *See* Ex. 2 to Defs. Ex. WWW at 32–33 (Zinger study cautions that "it would be ill advised to attempt to extrapolate the findings of this study (a) beyond

---

**25.** Most of the issues at bar were the subject of a series of meetings convened by the Special Master in October 2012. *See* Twenty–Fifth Round Monitoring Report (ECF No. 4298) at 34–38. Two meetings were held in 2012, and the Special Master intended to continue with the meetings and report on progress in subsequent monitoring reports. *Id.* at 38. "Among the issues to be addressed in upcoming meetings [we]re the elevated proportion of inmates in administrative segregation who are mentally ill, reduction of risks of decompensation and/or suicide, alternatives to use of administrative segregation placements for non-disciplinary reasons, access to treatment/mitigation of harshness of conditions in the administrative segregation units, suicide prevention, and reduction of lengths of stay in administrative segregation." *Id.* It is apparent that defendants' termination motion and the ensuing litigation interrupted that process.

**26.** Plaintiffs make a series of contentions and seek a variety of orders. The specific issues presented in the motion can be divided into six categories: (1) whether certain class members should be excluded from segregated housing altogether; (2) whether class members are improperly housed in disciplinary segregation units for non-disciplinary reasons; (3) whether class members are held in both administrative segregation and segregated housing units for excessive periods of time; (4) whether the mental health treatment program for administrative segregation units is adequate; (5) whether defendants perform adequate welfare checks on class members housed in segregation; and (6) whether security measures used in segregation units, including strip searches and holding cages, violate the Eighth Amendment rights of class members.

60 days of administrative segregation, and (2) to other jurisdictions. For example, the findings of this study are somewhat irrelevant to current segregation practices in the United States where prisoners can sometimes be segregated for years for disciplinary infractions with virtually no distractions, human contacts, services, or programs."); *see also* Ex. 1 to Defs. Ex. WWW at 11–12 ("Although this study incorporated several design features that improved on the capacity of previous research to draw conclusions about the effects of AS [Administrative Segregation], there are several limitations that affect its generalizability to other settings ... segregation conditions vary from state to state on a host of variables, including average duration of AS, double-bunking, televisions, exercise, selection criteria for AS, and quality and quantity of mental health and medical services. Thus, the results of the study can be generalized only to other prisons systems to the extent that their conditions of AS confinement are similar to Colorado's.[27]")[28] Second, in response to a question from the court, Dr. Scott agreed that there were studies he had confidence in "which demonstrate that ... going to ad seg has no consequences for the mentally ill," "primarily the O'Keefe and Metzner study ... [b]ut the Zinger was sort of a precursor to that." RT at 3359:13–23. The O'Keefe study specifically eschews such confidence:

> This study was not designed to address the question of whether segregation is an appropriate confinement option for

offenders, including those with serious and persistent mental illness. We are unaware of any treatment guidelines that suggests that long-term confinement in an AS environment would be clinically helpful.... We do not claim, nor believe, that these data definitively answer the question of whether long-term segregation causes psychological harm.... Frankly, having seen individuals in psychological crisis in segregation, we were surprised that such effects did not appear in these data. We believe that this study moves us forward, but that future research will shed additional light on this crucial question.

Ex. 1 to Defs. Ex. WWW at 12.

Despite Dr. Scott's testimony, the court concludes that confinement in California's administrative segregation units presents significant risks for seriously mentally ill individuals. As recently as last year, defendants' own experts reported on the harsh, "generally non-therapeutic" environment of California's administrative segregation units and recommended that the lengths of stay in such units be minimized for seriously mentally ill inmates. *Coleman v. Brown*, 938 F.Supp.2d at 979 (citing Clinical Exp. Rpt. (ECF No. 4275–5) at 20, 25). In addition, a disproportionately high rate of inmate suicides occur in these units. *See Coleman v. Brown*, 938 F.Supp.2d at 955. At the hearing, both parties introduced evidence of the number of inmate suicides in 2012 and 2013. Pls. Ex. 2781;

---

**27.** Dr. Scott testified to what he understands to be some of the "similarities and differences between the California ad seg and the Colorado ad seg." RT at 3344:14–16. Because he has never visited a California segregation unit, he compared descriptions in the O'Keefe article with provisions of the CDCR Mental Health Program Guide. RT at 3344:14–3345:6. He testified that he did not know

whether the prisons are conforming to the requirements of the Program Guide. RT at 3344:2–3345:3.

**28.** The O'Keefe study also cautioned that the conclusions of the Zinger study "must be interpreted cautiously" due to "high refusal and attrition rates." Ex. 1 to Defs. Ex. WWW at 3.

Defs. Ex. LLLL.[29] Defendants argue that the number of class member suicides in administrative segregation declined in 2013, and that "the number of class members who have committed suicide within segregation units, even considering those in Security Housing Units and Psychiatric Units, is not disproportionate to those outside the class." Defs. Post–Evidentiary Hearing Brief (ECF No. 4988) at 12. This argument misses the mark.

The findings concerning disproportion in inmate suicides in California's administrative segregation units are based on the suicide rate in ASUs, PSUs, and SHUs,[30] as compared to the suicide rate in non-segregated housing units. *See* Report on Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2012–June 30, 2012 (First Half 2012 Suicide Report) (ECF No. 4376) at 16 (the most meaningful measurement for assessing trends over time is "the number of suicides per inmate and the rate of suicides (i.e. the number of suicides per 100,000 inmates) within segregated housing units, as compared to the incidence and rate of suicides in non-segregated housing.") The suicide rate is derived from the total number of inmate suicides in these units, not just those committed by inmates who were at the time of their deaths identified at a level of care in the mental health services delivery system. *See, e.g.,* First Half 2012 Suicide Report (ECF No. 4376) at 4, 43; 2011 Suicide Report (ECF No. 4308) at 6, 26. Thirteen of the thirty-two inmate suicides in CDCR prisons in 2012 were committed in ASUs, PSUs, and SHUs. Pls. Ex. 2781. Through December 17, 2013, the same number—thirteen—of twenty-eight inmate suicides were committed in ASUs, PSUs, and SHUs. *Id.* Thus, the raw number of inmate suicides is unchanged and defendants' exhibit does not reflect the suicide rate.

Defendants acknowledge disproportion in the number of inmate suicides in administrative segregation. *See* Annual Report of Suicides in the CDCR During 2012, Ex. 2 to Declaration of Margot Mendelsohn filed February 5, 2014 (ECF No. 5051–1) at 18–19. The disproportion is evidence of the high risk environment in California's administrative segregation units, a risk faced by all inmates housed in those units and particularly those with a serious mental illness, a risk defendants have acknowledged.[31] *See id.* at 18. ("CDCR continues

---

**29.** The source of the data depicted in defendants' Ex. LLLL is not clear from the exhibit itself. Dr. Belavich testified that his attorney worked with Dr. Belavich's staff to prepare the chart. RT at 3704:24–3705:1. Dr. Belavich testified, *inter alia,* that he "trusted" that his staff's numbers "agreed with those" reported by the Special Master. RT at 3707:5–9. As it turns out, the numbers are not in complete agreement. Defendants' Ex. LLLL shows 33 inmate suicides in 2011. The Special Master reported 34 inmate suicides in 2011, a fact vigorously disputed by defendants. *See* Orders filed March 15, 2013 (ECF No. 4394) and March 22, 2013 (ECF No. 4435). Ultimately this court overruled defendants' objections and denied their motion to modify the number of inmate suicides reported by the Special Master for 2011. *See* Order filed March 22, 2013 (ECF No. 4435).

**30.** Inmate suicides in California's condemned unit, while reported by the Special Master, have not been included in the raw number of segregation unit suicides. *See, e.g.,* Report on Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2011 (2011 Suicide Report) (ECF No. 4308) at 6, 26.

**31.** The fact that in 2012, eleven of the thirteen were part of the mental health services delivery system at the time of their deaths, while only six of the thirteen were so identified in 2013 may be as suggestive of additional problems in California's administrative segregation units, including inadequate mental health assessments and suicide risk, or it might be of improvements that have reduced for one year the number of class member suicides in ad-

to treat segregation units as high-risk environments for vulnerable inmates, particularly during the period soon after placement.")

Together with the court's original findings and its findings on defendants' termination motion, the foregoing findings and the overwhelming weight of evidence in the record is that placement of seriously mentally ill inmates in California's segregated housing units can and does cause serious psychological harm, including decompensation, exacerbation of mental illness, inducement of psychosis, and increased risk of suicide. The question before the court is whether defendants have made progress since last year sufficient to remediate these serious risks of harm, or whether additional orders are required.

### A. *Administrative Segregation*

State regulations require administrative segregation of inmates whose safety is jeopardized in the general population as well as inmates who pose threats to the safety of others or "jeopardize[ ] the integrity of an investigation of an alleged serious misconduct or criminal activity." 15 C.C.R. § 3335(a).[32] Placement in administrative segregation may be for disciplinary or non-disciplinary reasons. *See* 15 C.C.R. §§ 3335, 3338; *see also* RT at 2898:2–2899:15; 2907:17–2908:19; Reply Austin Decl. (ECF No. 4762) at ¶ 18. "Administrative segregation may be accomplished by confinement in a designated segregation unit or, in an emergency, to any single cell unit capable of providing secure segregation." 15 C.C.R. § 3335(a). Adminis-

trative Segregation Units (ASUs) are distinguished from Segregated Program Housing Units (Security Housing Units (SHUs) and Psychiatric Services Units (PSUs) in that ASUs "are generally temporary segregation housing units which, as the name implies, are to administratively review the need for segregation, whereas Segregated Program Housing [Units] . . . are designed for extended term programming." Declaration of Kathleen Allison, filed July 24, 2013 (ECF No. 4713) at ¶ 9.

Certain reasons for removal of an inmate from the general population are not considered administrative segregation. *See* 15 C.C.R. § 3340. Two of those exclusions are relevant to the motion at bar:

(a) Medical. When an inmate is involuntarily removed from general inmate status for medical or psychiatric reasons by order of medical staff and the inmate's placement is in a hospital setting or in other housing as a medical quarantine, the inmate will not be deemed as segregated for the purpose of this article. When personnel other than medical staff order an inmate placed in administrative segregation for reasons related to apparent medical or psychiatric problems, that information will be immediately brought to the attention of medical staff. The appropriateness of administrative segregation or the need for movement to a hospital setting will be determined by medical staff. When medical and psychiatric reasons are involved, but are not the primary reasons for an inmate's placement in administrative segregation, administrative segregation status will be

---

ministrative segregation. That question is not before the court at this time.

**32.** The regulation provides: "When an inmate's presence in an institution's general population presents an immediate threat to the safety of the inmate or others, endangers

institution security or jeopardizes the integrity of an investigation of an alleged serious misconduct or criminal activity, the inmate shall be immediately removed from general population and be placed in administrative segregation." 15 C.C.R. § 3335(a).

continued if the inmate is moved to a hospital setting and the requirements of this article will apply.

(b) Orientation and Lay–Over. Newly received inmates and inmates in transit or lay-over status may be restricted to assigned quarters for that purpose. Such restrictions should not be more confining than is required for institution security and the safety of persons, nor for a period longer than the minimum time required to evaluate the safety and security factors and reassignment to more appropriate housing.

15 C.C.R. § 3340(a), (b).

Prior to amendments discussed *infra,* all inmates assigned to administrative segregation were placed in Privilege Group D. *See* Defs. Ex. OOO, Initial Statement of Reasons at 1. Placement in this highly restrictive group removes all family visits and access to "recreational or entertainment activities" and limits canteen draw, telephone calls, and personal property as follows:

(A) No family visits.

(B) One-fourth the maximum monthly canteen draw as authorized by the secretary.

(C) Telephone calls on an emergency basis only as determined by institution/facility staff.

(D) Yard access limited by local institution/facility security needs. No access to any other recreational or entertainment activities.

(E) The receipt of one personal property package, 30 pounds maximum weight, per year, exclusive of special purchases as provided in Section 3190. Inmates shall be eligible to acquire a personal property package after completion of one year of Privilege Group D assignment.

15 C.C.R. § 3044(g)(3).

### 1. *Non–Disciplinary Segregation*

In late 2013, defendants created and began to implement a new classification identified as non-disciplinary segregation (NDS). RT at 2904:12–2905:17; *see also* Defs. Ex. OOO. Non–Disciplinary Segregation is "Segregated housing placement for administrative reasons to include, but not limited to: ASU placement for safety concerns, investigations not related to misconduct or criminal activity, and/or being a relative or an associate of a prison staff member." RT at 2908:6–16. The Non–Disciplinary Segregation (NDS) classification is designed to "afford inmates segregated in ASU for non-disciplinary reasons privileges more consistent, but not identical, with their presegregation privilege group." Defs. Ex. OOO, Initial Statement of Reasons at 1. Inmates placed in the NDS category are still "limited to non-contact visits due to safety and security concerns as well as assisting in the prevention of contraband into the ASU." *Id.* at 2. In addition, yard access for NDS inmates is "limited by local institution/security needs and NDS inmates may be permitted to participate and have access to programs, services, and activities as can reasonably be provided in the unit without endangering the security and safety of persons, . . . ." *Id.*

At present, a "significant number" of *Coleman* class members are placed in administrative segregation units for non-disciplinary reasons, including safety concerns and lack of appropriate bed space. *See* RT at 2222:25–2227:6; RT at 2255:5–2256:20.[33] Defendants do not

---

**33.** The evidence concerning the number of class members in administrative segregation for non-disciplinary reasons was imprecise for a variety of reasons. See, *e.g.,* RT at

have separate housing units for disciplinary administrative segregation and non-disciplinary segregation placements or for inmates housed in administrative segregation pending transfer to an appropriate bed. *See* Reply Austin Decl. (ECF No. 4762) at ¶ 38. Defendants' new regulations say that "when practical and feasible" individual prison institutions should try to "cluster" inmates with a non-disciplinary segregation classification "into a specific section" within an administrative segregation unit. RT at 2964:23–2965:12. Dr. Haney testified that it is a "very unusual phenomenon," a "bad mix," and a "questionable" correctional practice to place inmates with safety concerns in the same segregation unit as inmates placed there for disciplinary reasons. RT at 2254:7–21.

Between 2007 and 2012, roughly half of the suicides in California's administrative segregation units were by inmates in administrative segregation for non-disciplinary reasons. RT at 2242:15–23; Pls. Ex. 2048. In January 2013, Dr. Robert Canning, defendants' Suicide Prevention Coordinator, issued a report analyzing CDCR suicides during this period. Pls. Ex. 2049. In his report, he noted that

> data collected by suicide evaluators found that many inmates who housed in ASU at the time of their deaths are placed there not for disciplinary reasons, but for safety reasons. Although there are many complexities surrounding these situations, it is worth noting that

placement in ASU of already fearful inmates may only serve to make them even more fearful and anxious, which may precipitate a state of panicked desperation, and the urge to die.

*Id.* at 2. Plaintiffs' expert, Dr. Haney, agreed with this opinion. RT at 2244:11–25.

Because of the absence of separate housing units, even with the new NDS classification class members in administrative segregation for non-disciplinary reasons are still subject to several significant restrictions placed on inmates housed in administrative segregation for disciplinary reasons, including no contact visits, significant limits on access to both exercise yards and dayroom, eating all meals in their cells, and being placed in handcuffs and restraints when being moved outside their cells. RT at 3200:1–19. Class members in administrative segregation for non-disciplinary reasons often receive mental health treatment in confined spaces described by plaintiffs' expert as "treatment cages." RT at 2167:20–23 (Haney). They are subjected to strip searches each time they leave their housing unit for mental health treatment and each time they return. RT at 2173:20–2175:14. Dr. Haney testified that in his opinion this practice "serves as a disincentive" for mentally ill inmates to go to treatment because the searches are "humiliating and degrading." RT at 2175:15–2176:6.

---

2428:1–25 (testimony of Craig Haney); RT at 3182:11–3186:18 (testimony of Kathleen Allison concerning differences between placement in administrative segregation for safety concerns versus non-disciplinary segregation classification and percentages of inmates in administrative segregation). While defendants offered evidence that only a "small number" of class members had been classified in the non-disciplinary segregation category, *see* Defs. Ex. QQQ, it is evident that the

process of classifying inmates into the NDS category is ongoing and the number of inmates on Ex. QQQ does not represent the total number of class members housed in administrative segregation units for non-disciplinary reasons. *See* RT:2987:23–2988:6. Moreover, Ms. Allison testified at her deposition that twenty to thirty percent of inmates in administrative segregation were there for non-disciplinary reasons. RT at 3185:11–3186:18.

During the hearing, defendants presented the court with a memorandum dated December 3, 2013 limiting to thirty and sixty days respectively administrative segregation placements of EOP and CCCMS inmates with an NDS classification. Defs. Ex. RRR.[34] The memorandum includes deadlines for presentation of these cases to a classification staff representative (CSR) to "facilitate the CSR referral, endorsement, and transfer process." *Id.* Finally, it requires reporting of all such cases that exceed the deadline to the relevant institution's Associate Director, who "shall provide assistance and support when appropriate to the institutions to remedying identified impediments to release or transfer." *Id.* Given the significant mental health risks posted by placement in these units, these times frames are too long.

Seriously mentally ill inmates in administrative segregation for non-disciplinary reasons have done nothing to transgress the rules of the institution. They are generally in need of protection or placement where they have access to necessary mental health services. The only explanation offered in the record for California's failure to have separate units for disciplinary and non-disciplinary segregation is the overcrowded conditions that have plagued the prison system for at least a decade. *See* Reply Austin Decl. (ECF No. 4762) at ¶ 39. The only explanations tendered for defendants' failure to expedite transfer of class members in administrative segregation for non-disciplinary reasons, including

safety concerns and lack of appropriate bed space, are overcrowded prison conditions, an insufficient number of buses to accomplish timely transfers, and the length of time it takes to complete the administrative processes required for transfer. *See id.* at ¶¶ 39, 44; *see also* RT at 2129:13–24; RT:3190:1–3191:24.[35] None of these explanations justify subjecting these class members to these conditions for these periods of time.

Plaintiffs' expert, Dr. James Austin, testified that there is "no reason" to hold class members in non-disciplinary segregation for these period of time, and that in states he works in, inmates who need to be transferred to an appropriate mental health bed placement are transferred within twenty-four hours. RT at 3021:8–3022:11. CDCR's then Acting Statewide Director of Mental Health, Dr. Timothy Belavich,[36] agrees that mentally ill inmates in administrative segregation for non-disciplinary reasons should be moved to an appropriate program "as quickly" as possible. RT at 3563:7–12, 3564:17–21.

Mentally ill inmates in administrative segregation for non-disciplinary reasons "are treated, for obvious intents and purposes, as if they are in an administrative segregation prison there for disciplinary reasons even though they're not." RT at 2167:20–2168:4; *see also* Reply Austin Decl. (ECF No. 4762) at ¶ 45 (even with new NDS classification " 'non-disciplinary' prisoners will still be mixed with disciplin-

---

**34.** The NDS classification designation must be made by an Institution Classification Committee (ICC) and it takes ten calendar days from the time an inmate arrives in administrative segregation to be seen by an ICC for classification. RT at 2989:1–11. Thus, the total length of stay for NDS inmate-patients under the new policy would actually be forty days for EOP inmates and seventy days for CCCMS inmates.

**35.** Defendants have a separate transportation system for inmates who require transfer to Mental Health Crisis Beds. *See* RT at 3462:17–3463:12. Ms. Allison testified that defendants have considered using this system "as an option" to expedite transfers of NDS EOP inmates from administrative segregation units. RT at 3221:24–3222:3.

**36.** Dr. Belavich is now the Director of CDCR's Division of Health Care Services.

ary or disruptive prisoners in the same segregation units and be subject to the same custodial restrictions, including very limited out-of-cell time and no access to work, education, and other meaningful programs.") Dr. Haney testified that it is "utterly inappropriate" to house these inmates in these units "on more than a very short-term basis." RT at 2224:11–12.

> We're talking about mental patients who are now not only vulnerable because they're mental patients but vulnerable because they have safety concerns, being placed in an environment that we know is harmful to the mental health of the mentally ill prisoners who are placed there.
>
> So they are doubly at risk. They go in as vulnerable mental health prisoner, ... who are now at risk and all the psychological burden that carries with it, and they're placed in an environment in which they're in isolation and locked in their cells basically 23 hours a day.

RT at 2224:21–2225:7. Dr. Haney also testified that although such mixed placements "could be done on an expedient basis" if there is nowhere else to put an inmate with safety concerns, that should be accompanied by a sense of urgency to move the inmate with safety concerns to a non-administrative or lockdown setting. RT at 2254:22–2255:4.

In December 2012, defendants issued an operational plan for disabled inmates covered by the *Armstrong* class action.[37] The operational plan covers *Armstrong* class members housed in administrative segregation "due solely to a lack of appropriate

accessible General Population (GP) housing (including Sensitive Needs GP)." Ex. 9 to Declaration of Jane Kahn filed May 6, 2013 (ECF No. 4582) at 97. The procedure set forth in the model plan sets forth specific procedures for these inmates, requires that they be moved out of administrative segregation within 48 hours, and provides specific notice procedures for three business days following initial placement of these inmates in administrative segregation. *Id.* There is no apparent reason for the distinction between *Armstrong & Coleman* class members.

■ For all of the foregoing reasons, the court finds that placement of seriously mentally ill inmates in the harsh, restrictive and non-therapeutic conditions of California's administrative segregation units for non-disciplinary reasons for more than a minimal period necessary to effect transfer to protective housing or a housing assignment violates the Eighth Amendment.[38] The record suggests several options to remedy this constitutional violation, including but not limited to creation of separate units for disciplinary and non-disciplinary segregation, or adoption of a policy modeled on the *Armstrong* operational plan for *Coleman* class members. Defendants will be required, within thirty days, to present the court with a plan to remedy this ongoing violation and they shall be prepared to implement the plan within thirty days thereafter. Defendants shall commence forthwith to reduce the number of Coleman class members housed for non-disciplinary reasons in any administrative segregation unit that houses dis-

---

37. *Armstrong v. Brown*, No. C94–2307 CW (N.D.Cal.)

38. It is settled that prison inmates have no liberty interest in remaining in the general prison population and that the due process clause is not violated by the transfer of prison inmates to more restrictive settings for non-

punitive reasons. *See, e.g., Anderson v. County of Kern*, 45 F.3d 1310, 1315 (9th Cir.1995). They do, however, retain the protections of the Eighth Amendment in such settings. *See Sandin v. Conner*, 515 U.S. 472, 487 n. 11, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

ciplinary segregation inmates. Commencing sixty days from the date of this order, defendants will be prohibited from placing any *Coleman* class member in any administrative segregation unit that houses disciplinary segregation inmates for a period of more than seventy-two hours if the placement is for non-disciplinary reasons including but not limited to safety concerns or lack of appropriate bed space.

### 2. *Placement/Retention/Return to Administrative Segregation*

 Plaintiffs raise a number of issues related to placement of at risk class members in administrative segregation, lengths of stay in administrative segregation units, and adequacy of care provided particularly to EOP inmate-patients. At the core, resolution of these issues turns on a common question: what is the proper role of mental health clinicians in the housing decisions presented when seriously mentally ill inmates must be removed from a prison's general population for disciplinary reasons.[39] As with the issues related to use of force and rules violation reports already discussed, defendants have not yet adequately incorporated necessary clinical judgments into these decisions.

The evidence tendered at the hearing demonstrates that the role of the mental health clinician is integral to placement decisions in two separate but related ways.

In relevant part, the Eighth Amendment prohibits placements of seriously mentally ill inmates in conditions that pose a substantial risk of exacerbation of mental illness, decompensation, or suicide. These risks may arise from an individual inmate-patient's particular mental state and/or history of mental illness, from the adequacy of care available in the proposed housing placement, or both. Accurate and adequate assessment of these risks requires the exercise of clinical judgment, and where that clinical judgment demonstrates existence of the risk that must be avoided that judgment cannot be overridden by custodial requirements. Instead, in situations where clinical judgment demonstrates an unacceptable level of risk alternative placements must be made.[40]

The Program Guide contains a structure for delivery of mental health services in administrative segregation, identified as the Administrative Segregation Unit (ASU) Mental Health Services (MHS) program. Pls. Ex. 1200 at 12–7–1. Responsibility for the ASU MHS program at each institution rests jointly with the Health Care manager and the Warden. *Id.* Operational oversight for the ASU MHS lies with the Chief of Mental Health for each institution. *Id.*

Custodial responsibilities, including initial placement, disciplinary actions, cor-

---

**39.** A separate issue arose at the hearing concerning the accuracy of defendants' data concerning, in particular, lengths of stay in administrative segregation and segregated housing units. Going forward, defendants will be required to provide to the Special Master accurate information that clearly demonstrates the total length of time that any *Coleman* class member spends in any administrative segregation unit or segregated housing unit.

**40.** The record shows that there are programs in place in other jurisdictions which separate seriously mentally ill inmates from general

population for disciplinary reasons and impose conditions on release from these programs without subjecting high-risk mentally ill inmates to the harsh conditions in California's segregation units. *See* Reply Austin Decl. (ECF No. 4762) at ¶¶ 35–37. The court wishes to be clear, if rules violations occur which are not the result of an inmate's mental illness, the state may, of course, impose appropriate sanctions. What the state cannot do is impose sanctions, which by virtue of the inmate's mental status, risks further deterioration.

rectional counseling services, classification, inmate-patient movement, and daily management shall rest with the Warden or designee. The assigned psychiatrist or Primary Clinician (PC) shall attend all Institutional Classification Committee (ICC) meetings to provide mental health input.

Individual clinical case management, including treatment planning, level of care determination and placement recommendations, are performed by the assigned PC and approved by the institution Interdisciplinary Treatment Team (IDTT). *Id.* The Interdisciplinary Treatment Team must include, at a minimum, the assigned primary clinician (PC), the assigned psychiatrist, the licensed psychiatric technician (LPT) and the assigned correctional counselor. *Id.* at 12–7–13.

Most of the ASU MHS program objectives appear designed to prevent the identified risks of harm. *See id.* at 12–7–2. *Id.* at 12–7–2.

The Program Guide requires a pre-placement mental health screening of "all inmates" prior to placement in administrative segregation. *Id.* at 12–7–2. This screening is "for possible suicide risk, safety concerns, and mental health problems." *Id.* An inmate who "screens positive" is "referred for a mental health evaluation on an Emergent, Urgent, or Routine basis." *Id.* The Program Guide also requires review of "all inmates" placed in ASU for "identification of current MHSDS treatment status," said review to occur within one work day of placement in ASU. *Id.* at 12–7–3. Mental health staff are required to "ensure the continuity of mental health care, including the delivery of prescribed medications." *Id.*

From the foregoing, it appears that, if adequately implemented, the ASU MHS screening system is designed to capture most, if not all, of the clinical information necessary to a determination of whether a particular *Coleman* class member faces a substantial risk of exacerbation of mental illness, decompensation, or suicide from placement in administrative segregation.[41] The relevant information should be contained in the class member's unit health record and known to his or her treating clinician at the time that ASU placement is considered. *See also* RT at 3570:15–3571:21. The final housing decision, however, rests with the Institution Classification Committee, and there are no guidelines for weight to be given clinical criteria in the placement decisions.

Dr. Belavich testified that at present mental health staff are not consulted about whether the mental health of class members facing segregation is sufficiently stable to withstand the mental health consequences of such placement. RT at 3688:21–3689:3. He was of the view that clinicians should be so consulted. RT at 3689:4–9. Dr. Belavich also testified that he and his staff could work with custody staff to develop a plan for additional mental health input into the segregation placement process.[42] RT at 3693:3–13.

---

**41.** The record shows that questions about the accuracy of the present screening instrument arose over three years ago. *See* Ex. 45 to Confidential Declaration of Jane Kahn, filed March 18, 2013 (ECF 4411–7 *SEALED*) (Minutes of November 8, 2010 Suicide Prevention and Response–Focused Improvement Team (SPR FIT), at 74. If they have not been, those must be resolved going forward.

**42.** During Dr. Belavich's testimony, counsel for defendants offered to "suspend the proceedings to discuss these issues." RT at 3692:22–24. While the court decided to complete the hearing, the court infers from testimony from Dr. Belavich as well as counsel's representation that defendants will bring due diligence to the task required by this order.

The court concludes that defendants must develop a protocol for placement decisions, including, as appropriate, a plan for alternative housing, that will preclude placement of any *Coleman* class member in existing administrative segregation units when clinical information demonstrates substantial risk of exacerbation of mental illness, decompensation, or suicide from such placement.

Class members who can be placed in administrative segregation without the foregoing substantial risks of harm must have access to adequate mental health care during the placement. The Program Guide includes mental health services in administrative segregation units. The ASU MHS program is designed to provide mental health services for CCCMS inmate-patients in every administrative segregation unit at a level that equals or exceeds the mental health services provided to CCCMS patients in the general population. *See* Pls. Ex. 1200, Program Guide at 12–3–8 to 12–3–10; 12–7–7; *see also* RT at 3467:17–3468:3.

EOP services are only provided in EOP ASU "hubs."[43] The Program Guide has three options for inmate-patients placed in ASU who require an EOP level of care: (1) "Referral to an EOP program for inmate-patients who are involved in non-violent incidents and determined not to be a risk to others;" (2) "Inmate-patients who are involved in serious rules violations and whose propensity for threat to others and/or the security of the institution is so high that no other alternative placement is considered appropriate" are to be transferred to one the EOP ASU hubs within thirty days; and (3) inmates who are serving "established and endorsed SHU terms" are transferred to a Psychiatric Services Units (PSU).[44] Pls. Ex. 1200, Program Guide at 12–7–8.

The specific treatment criteria for the EOP level of care requires the presence of either acute onset of symptoms or significant decompensation due to mental illness, an inability to function in the general population, or both. *Id.* at 12–4–3, 12–4–4.[45]

**43.** There are eleven EOP ASU hubs located at Central California Women's Facility (CCWF), California Institution for Women (CIW), California Medical Facility (CMF), California State Prison–Corcoran (COR), California State Prison–Los Angeles County (CSP–LAC), Mule Creek State Prison (MCSP), R.J. Donovan (RJD), California State Prison–Sacramento (SAC), San Quentin State Prison (SQ), and Salinas Valley State Prison (SVSP). Defs. Ex. ZZZ. On October 25, 2013, there were a total of 579 EOP inmate-patients in ASUs, 48 of whom were in non-hub ASUs. *Id.* Systemwide, there were a total of 600 EOP ASU hub beds; twenty-one were vacant. *Id.*

**44.** PSUs are at Pelican Bay, CIW, and SAC.

**45.** Acute Onset or Significant Decompensation of a serious mental disorder characterized by symptoms such as increased delusional thinking, hallucinatory experiences, marked changes in affect, and vegetative signs with definitive impairment of reality testing and/or judgment; and/or

Inability to Function in General Population Based Upon:
a. A demonstrated inability to program in work or educational assignments, or other correctional activities such as religious services, self-help programming, canteen, recreational activities, visiting, etc. as a consequence of a serious mental disorder; or
b. The presence of dysfunctional or disruptive social interaction including withdrawal, bizarre or disruptive behavior, extreme argumentativeness, inability to respond to staff directions, provocative behavior toward others, inappropriate sexual behavior, etc., as a consequence of a serious mental disorder; or
c. An impairment in the activities of daily living including eating, grooming and personal hygiene, maintenance of housing area, and ambulation, as a consequence of a serious mental disorder.
These conditions usually result in Global Assessment Functioning (GAF) Scores of less than 50.

The evidence shows that the risks of harm for these inmate-patients can be significantly higher in administrative segregation units. Defendants' termination experts and plaintiffs' experts both opined that placement of EOP inmates in administrative segregation should be strictly limited, even where an EOP level of care is provided. *See* Defs. Ex. HHH (ECF No. 4275–5) at 23, 25; Expert Declaration of Craig Haney, filed May 6, 2013 (ECF No. 4581) at ¶ 29. Dr. Belavich also testified that his "goal as a clinician" is to get EOP inmate-patients into a PSU "as soon as I can." RT at 3564:22–3565:8.

"Remedial efforts over the past six years have focused on reducing the length of time EOP inmates remain in administrative segregation and providing appropriate clinical care for EOP inmates housed in such units." *Coleman v. Brown,* 938 F.Supp.2d at 979. As already discussed, defendants' termination experts reported that the environment in CDCR's administrative segregation units "is not therapeutic" and that even where EOP levels of care are provided "segregation is not a particularly therapeutic environment to house inmates with serious mental disorders." Defs. Ex. HHH (ECF No. 4275–5) at 23, 25.[46] In his Twenty–Fifth Round Monitoring Report, the Special Master reported that "ten of the 11 [EOP–ASU] hubs failed to offer at least ten hours per week of structured therapeutic activity per week. Only CIW was able to meet that benchmark. Structured therapeutic activity is a critical part of EOP care in general. This is particularly true in segregation units, where the group dynamic and interaction with others can help ameliorate the anti-therapeutic effects of isolation on the mentally ill patient." Twenty–Fifth Round Monitoring Report (ECF No. 4298) at 37.

Some evidence presented at the hearing suggested recent improvements in the provision of care in certain EOP Ad Seg hubs. *See, e.g.,* Defs. Ex. DDDD (compiling compliance rate with certain Program Guide requirements for the month of October 2013); Defs., Ex. GGGG. (compiling data on group therapy in EOP ASUs, EOP PSUs, and for CCCMS patients in ASU and two SHUs). Overall review of the record suggests that the adequacy of care in individual EOP ASU hubs varies based on several factors, including the physical plant, available treatment space, and staffing levels. *See, e.g.,* RT at 3495:2–13; Twenty–Fifth Round Monitoring Report (ECF No. 4298) at 37.

As discussed above, the Program Guide contains specific requirements for necessary care in general administrative segregation units and EOP ASU hubs. Dr. Belavich testified that he receives substantial data from his staff that he uses to review quality of care issues in these units, and the court was impressed by his apparent diligence. Plainly, defendants cannot house seriously mentally ill inmates in settings where defendants know those inmates cannot receive the minimally adequate mental health care required by the Program Guide. Whether or not the care provided in each EOP ASU hub meets Program Guide requirements is, again, a clinical judgment and one that must be exercised by Dr. Belavich and his staff. Accordingly, defendants will be required to provide monthly reports on whether each EOP ASU hub meets Program Guide requirements for an EOP ASU level of care and they will be prevented from admitting

---

**46.** Taken together with the treatment criteria for the EOP level of care, which requires significant impairment preventing functioning in a general population setting, the fact that defendants' own experts found the EOP–ASU hub environment "not particularly therapeutic" continues to be of grave concern to this court.

any *Coleman* class member at the EOP level of care to any EOP ASU hub that does not meet or exceed Program Guide requirements for a period of more than two consecutive months. Moreover, defendants will also be prevented from placing any *Coleman* class member at the EOP level of care in any administrative segregation unit during any period in which there are an insufficient number of EOP Ad Seg Hub beds available.

### 3. *Strip Searches*

Plaintiffs seeks an order prohibiting defendants from continuing their strip search policy in administrative segregation units. Dr. Belavich testified that he was concerned that this policy inhibited treatment and was aware that it needed to be revisited. RT at 3503:18–3505:3. Defendants will be directed to provide a revised policy to the court within sixty days.

### 4. *Suicide Prevention Measures*

Plaintiffs seek a series of orders relative to suicide prevention. *See* Pls. Post–Trial Brief Re: Enforcement of Court Orders, filed January 21, 2014 (ECF No. 4985) at 30–33. By minute order issued July 26, 2013, the court dropped consideration of issues related to inmate suicide without prejudice to their renewal, if appropriate, following a report from the Suicide Prevention/Management Work Group. That order stands.

### B. *Segregated Housing Units*

In addition to numerous administrative segregation units, California's prison system has three types of "Segregated Program Housing Units." 15 C.C.R. § 3341.5. Protective Housing Units (PHUs) are for the protection of inmates "whose safety would be endangered by general population placement" and who meet specified criteria. 15 C.C.R. § 3341.5(a). Security Housing Units (SHUs) are for inmates "whose conduct endangers the safety of others or the security of the institution." 15 C.C.R. § 3341.5(c). Psychiatric Services Units (PSUs) are for seriously mentally ill inmates in the Enhanced Outpatient Program (EOP) who require the equivalent of SHU placement. 15 C.C.R. § 3341.5(b).

In general, inmates may be placed in a SHU following conviction of certain disciplinary offenses or after validation as a member of a prison gang. *See* 15 C.C.R. § 3341.5(c)(1), (2)(A)(2). SHU terms may be determinate or indeterminate. 15 C.C.R. § 3341.5(c)(2)(A), (B). An inmate subject to an indeterminate SHU term whose SHU term is suspended "based solely on the need for inpatient medical or mental health treatment" may have the term "reimposed without subsequent misbehavior if the inmate continues to pose a threat to the safety of others or the security of the institution." 15 C.C.R. § 3341.5(c)(A)(3).

■ With very limited exceptions, almost all seriously mentally ill inmates are excluded from the Pelican Bay SHU. *See* Pls. Ex. 1200 at 12–8–1 to 12–8–3.[47] In

---

**47.** Exclusion of seriously mentally ill inmates from the Pelican Bay SHU is the result of a 1995 order in a separate class action lawsuit, *Madrid v. Gomez*, No. C90–3094 TEH (N.D.Cal.). The *Madrid* court found, *inter alia*, Eighth Amendment violations in SHU placement of "the already mentally ill, as well as persons with borderline personality disorders, brain damage or mental retardation, impulse-ridden personalities, or a history of prior psychiatric problems or chronic depression" because these inmates were found to be "at a particularly high risk for suffering very serious or severe injury to their mental health, including overt paranoia, psychotic breaks with reality, or massive exacerbations of existing mental illness as a result of conditions in the SHU." *Madrid v. Gomez*, 889 F.Supp. 1146, 1265–66 (N.D.Cal.1995). The *Madrid* court determined that

addition, male inmates requiring an EOP level of care are not housed in any of the other three SHU units for male inmates and are instead placed in PSUs.[48] Pls. Ex. 1200 at 12-8-1. There is no similar exclusion for female inmates. *See id.* The Program Guide calls for provision of CCCMS services in the three male SHUs other than Pelican Bay SHU. *Id.*

Plaintiffs seek an order extending the Pelican Bay SHU exclusion in the Program Guide to the other four segregated housing units in California's prison system.[49] Defendants oppose the request, contending that (1) only inmates at the CCCMS level of care are housed in SHU units; (2) appropriate mental health services, consistent with Program Guide requirements, are provided to inmates housed in SHUs; (3) the SHU units other than Pelican Bay have natural light, less restrictive exercise yards, and allow for electrical appliances, including televisions and radios, in cells; and (4) "increasing data" suggests "that segregation does not cause the type and severity of psychological harm" described by plaintiffs' expert, Dr. Haney. Defs. Opp'n (ECF No. 4712) at 29.

First, both parties have tendered expert opinions and other evidence concerning whether or not prolonged placement of seriously mentally ill inmates in segregated housing units causes psychological harm to those individuals. The court has already found that, for seriously mentally ill inmates, placement in California's segregated housing units, including both administrative segregation units and SHUs, can and does cause serious psychological harm, including decompensation, exacerbation of mental illness, inducement of psychosis, and increased risk of suicide. *See Coleman v. Wilson,* 912 F.Supp. at 1320–1321; *see also* Findings and Recommendations, filed June 6, 1994 (Dkt. 547) at 51–54. Nothing in the evidence tendered on the current motions requires revisiting those findings.[50]

subjecting individuals to conditions that are "very likely" to render them psychotic or otherwise inflict a serious mental illness or seriously exacerbate an existing mental illness cannot be squared with evolving standards of humanity or decency, especially when certain aspects of those conditions appear to bear little relation to security concerns. A risk this grave—this shocking and indecent—simply has no place in civilized society. It is surely not one "today's society [would] choose[] to tolerate." ... Indeed, it is inconceivable that any representative portion of our society would put its imprimatur on a plan to subject the mentally ill and other inmates described above to the SHU, knowing that severe psychological consequences will most probably befall those inmates. Thus, with respect to this limited population of the inmate class, plaintiffs have established that continued confinement in the SHU, as it is currently constituted, deprives inmates of a minimal civilized level of one of life's necessities.

*Id.* at 1266 (quoting *Helling v. McKinney,* 509 U.S. 25, 113 S.Ct. 2475, 2482, 125 L.Ed.2d 22 (1993)).

**48.** In September 2013, 361 seriously mentally ill inmates were housed in a psychiatric services unit (PSU). Pls. Ex. 2303.

**49.** California Institution for Women (CIW); California Correctional Institution (CCI); California State Prison–Corcoran (COR); and California State Prison–Sacramento (SAC).

**50.** The evidence tendered by the parties would certainly bear on an inquiry into whether housing seriously mentally ill inmates in segregation comports with contemporary values, a question not before this court at this stage of these proceedings. "[T]he Eighth Amendment's prohibition of cruel and unusual punishments " 'draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society,' "...." *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (internal citations omitted). To the extent possible, courts look to " 'objective indicia'

Defendants also contend that measuring compliance with their Revised Program Guide "is an appropriate way to assess whether defendants are meeting their constitutional obligations." *Coleman v. Brown,* 938 F.Supp.2d at 972 n. 30. Defendants' Revised Program Guide is the "currently operative remedial plan" in this action, and represents " 'defendants' considered assessment, made in consultation with the Special Master and his experts, and approved by this court, of what is required to remedy the Eighth Amendment violations identified in this action and to meet their constitutional obligation to deliver adequate mental health care to seriously mentally ill inmates.' " *Id.* at 972 (internal citation omitted.) While the court has approved "[n]inety-five percent of the provisions of the Revised Program Guide", *id.* at 972 & n. 31, certain disputed issues were reserved for resolution when the court gave that approval. *See* Order filed March 3, 2006 (ECF No. 1773). Whether the Pelican Bay SHU exclusions should be extended to all SHUs was one of the disputed issues that remained for resolution, as was the adequacy of mental health care provided to class members housed in SHUs. *See* Special Master's Report and Recommendations on Defendants' Revised Program Guide, filed February 3, 2006 (ECF No. 1749) at 8–9. Thus, the provisions of the Program Guide are not dispositive of the question at bar.

Third, the fact that only CCCMS inmates are housed in SHU units narrows the question but does not end the inquiry. The Pelican Bay SHU exclusion includes almost all of the treatment categories for the CCCMS level of care.[51] It is also broader than the CCCMS criteria. In relevant part, treatment criteria for the CCCMS level of care include *current* symptoms of specified Axis I serious mental disorders, Pls. Ex. 1200 at 12–3–4, while the Pelican Bay SHU exclusion extends to inmates who currently have symptoms of those disorders or who have had such symptoms "within the preceding three months." *Id.* at 12–8–2.

derived from, *inter alia,* history, common law, and legislative action to determine whether particular punishments violate contemporary values." *Rhodes v. Chapman,* 452 U.S. at 347, 101 S.Ct. 2392 (internal citations omitted). Available evidence suggests that contemporary values are moving away from placement of seriously mentally ill prisoners in segregated housing, particularly for periods as long as placements currently used in California. *See* Pls. Ex. 2054 (American Psychiatric Association (APA) December 2012 official policy on segregation of adult inmates with serious mental illness); Statement of Interest of the United States of America, filed August 9, 2013 (ECF No. 4736) (finding Eighth Amendment violations in the "manner in which the Pennsylvania Department of Corrections used solitary confinement on prisoners with serious mental illness. . . ."); Reply Austin Decl. (ECF No. 4762) at ¶¶ 36, 50 (Mississippi, Georgia, New Mexico, Colorado and Oklahoma all exclude "most or all prisoners with diagnosed mental illnesses" from their "punitive segregations units" and instead assign those inmates "to a specialized mental health unit"; Ohio also requires prompt transfer of seriously mentally ill inmates out of segregated housing.) In addition, news reports suggest that other jurisdictions, including the New York City Department of Correction, *see* http://online.wsj.com/news/articles/SB10001424 05270230461740457930284042591 0088; and New York State, *see* http://www.npr.org/2014/02/23/281373188/n-y-becomes-largest-prison-system-to-curb-solitary-confinement, are ending the placement of mentally ill inmates in solitary confinement.

**51.** Treatment criteria for CCCMS also include inmates diagnosed with exhibitionism, which is not included in the Pelican Bay exclusions. *See* Pls. Ex. 1200 at 12–3–5, 12–8–1, 12–8–2. However, SHU inmates who receive a rules violation report for "Indecent Exposure or Intentionally Sustained Masturbation with Exposure" are referred for a mental health assessment which must "be completed within 24 hours to rule-out decompensation and/or intoxication." *Id.* at 12–8–6.

Resolution of the question at bar turns, then, on two disputed issues: whether the conditions of confinement ·in other SHU units are materially different from the conditions of confinement in the Pelican Bay SHU, and whether the mental health care provided in other SHU units is constitutionally sufficient.

As discussed above, the conditions of SHU confinement include both the physical conditions of the housing units and the exercise yards, and the restrictions that attach to classification for SHU housing. The restrictions are the same for all SHU inmates; that is part of the classification process. Thus, it is undisputed that the highly restrictive programming in the Pelican Bay SHU is the same in all of California's SHU units. All SHU inmates are confined to their cells for approximately twenty-three hours per day. Haney Decl. (ECF No. 4581) at ¶ 23.

The primary difference between the Pelican Bay SHU and the other SHU units is that the cells in the Pelican Bay SHU "are windowless and do not face other cells across the pod, and the 'yards' consist of concrete enclosed spaces rather than cages." Haney Decl. (ECF No. 4581) at ¶ 18; *see also* Allison Decl. (ECF No. 4713) at ¶ 26.[52]

Only CCCMS care is provided in SHU units. Pls. Ex. 1200 at 12–8–1. Male inmates requiring EOP level of care are referred to a psychiatric services unit (PSU). *Id.* at 12–8–1, 12–8–10. The Program Guide provides that "[f]emale inmate-patients [who require an EOP level of care] will continue to be treated in SHU ... until a PSU for female inmate-patients is established." *Id.* at 12–8–11, 12–8–12. There is currently a 20 bed PSU for fe-

male inmates at California Institution for Women (CIW). *See* Ex. A to Pls. March 3, 2014 Request for Judicial Notice (ECF No. 5093), at 14.

As discussed above, this question goes to the heart of the tension between legitimate penological goals of prison institutions, including the need for order and discipline, and the requirements of the Eighth Amendment. The record before the court amply demonstrates that there are many seriously mentally ill inmates at the CCCMS level of care who cannot be housed in any SHU in California without running afoul of the Eighth Amendment. It is not clear that this is true for all inmates at the CCCMS level of care. For that reason, the court will not at this time require the blanket exclusion requested by plaintiffs. Instead, defendants will be prohibited from housing any seriously mentally ill inmate at any SHU in California unless that inmate's treating clinician certifies that (1) the inmate's behavior leading to the SHU assignment was not the product of mental illness and the inmate's mental illness did not preclude the inmate from conforming his or her conduct to the relevant institutional requirements; (2) the inmate's mental illness can be safely and adequately managed in the SHU to which the inmate will be assigned for the entire length of the SHU term; and (3) the inmate does not face a substantial risk of exacerbation of his or her mental illness or decompensation as a result of confinement in a SHU. In addition, defendants will be prohibited from returning any seriously mentally ill inmate to any SHU unit if said inmate has, following placement in a SHU, required a higher level of mental health

**52.** There is minimal natural light in the Pelican Bay SHU: "A skylight in each pod does allow some natural light to enter the tier area adjacent to the cells.... Inmates can spend

years without ever seeing any aspect of the outside world except for a small patch of sky." *Madrid v. Gomez,* 889 F.Supp. 1146, 1228, 1229 (N.D.Cal.1995).

care.[53]

For all of the foregoing reasons, plaintiffs' motions will be granted in part.

### III. *Standards for Injunctive Relief*

The court does, by this order, direct specific action by defendants. In this court's view, the orders contained herein are in aid of the remedy required by the court's 1995 order. To the extent that the requirements of 18 U.S.C. § 3626(a)(1) may apply, this court finds that the orders contained herein are narrowly drawn, extend no further than necessary to correct the Eighth Amendment violations found at the trial of this matter and still ongoing, and are the least intrusive means to that end. *See* 18 U.S.C. § 3626(a)(1)(A).

In accordance with the above, IT IS HEREBY ORDERED that:

1. Plaintiffs' May 29, 2013 motion for enforcement of court orders and affirmative relief related to use of force and disciplinary measures (ECF No. 4638) is granted in part as follows:

a. Defendants shall work under the guidance of the Special Master to revise their use of force policies and procedures as required by this order. Said revisions shall be completed within sixty days from the date of this order.

b. The Special Master shall report to the court within six months whether defendants have adequately implemented the RVR policies and procedures agreed to in 2011.

c. Defendants shall work with the Special Master on a timeline for completion of their review of the use of management status so that this practice can be reviewed by the Special Master as part of his review of the implementation of defendants' RVR policies and procedures.

2. Plaintiffs' May 6, 2013 motion for enforcement of judgment and affirmative orders related to segregated housing (ECF No. 4580) is granted in part as follows:

a. Within thirty days from the date of this order defendants shall file a plan to limit or eliminate altogether placement of class members removed from the general population for non-disciplinary reasons in administrative segregations units that house inmates removed from the general population for disciplinary reasons. Defendants shall be prepared to fully implement the plan within thirty days thereafter. Defendants shall commence forthwith to reduce the number of *Coleman* class members housed for non-disciplinary reasons in any administrative segregation unit that houses disciplinary segregation inmates. Commencing sixty days from the date of this order, defendants will be prohibited from placing any class members removed from the general population for non-disciplinary reasons for more than seventy-two hours in administrative segregations units that house inmates removed from the general population for disciplinary reasons.

b. Defendants shall work under the guidance of the Special Master to develop a protocol for administrative segregation decisions, including, as appropriate, a plan for alternative housing, that will preclude placement of any *Coleman* class member in existing administrative

---

**53.** Plaintiffs have requested that defendants be ordered to develop treatment-based disciplinary programs for *Coleman* class members. Given the necessity of the restrictions imposed by this order, defendants may want to seriously consider voluntarily adopting such programs as this may provide a more straightforward means of planning for appropriate housing and treatment of mentally ill offenders.

segregation units when clinical information demonstrates substantial risk of exacerbation of mental illness, decompensation, or suicide from such placement.

c. Defendants shall forthwith provide to the court and the Special Master monthly reports on whether each EOP ASU hub meets Program Guide requirements for an EOP ASU level of care. Commencing sixty days from the date of this order, defendants shall not admit any *Coleman* class member at the EOP level of care to any EOP ASU hub that has failed to meet or exceed Program Guide requirements for a period of more than two consecutive months. Commencing sixty days from the date of this order, defendants shall not place any class member at the EOP level of care in any administrative segregation unit during any period in which there are an insufficient number of EOP Ad Seg Hub beds available unless failure to remove the inmate from the general population presents an imminent threat to life or safety.

d. Within sixty days from the date of this order defendants shall file a revised policy concerning strip searches in EOP ASU hubs.

e. Defendants are prohibited from housing any class member at any SHU in California unless that class member's treating clinician certifies that (1) the behavior leading to the SHU assignment was not the product of mental illness and the inmate's mental illness did not preclude the inmate from conforming his or her conduct to the relevant institutional requirements; (2) the inmate's mental illness can be safely and adequately managed in the SHU to which the inmate will be assigned for the entire length of the SHU term; and (3) the inmate does not face a substantial risk of exacerbation of his or her mental illness or decompensation as a result of confinement in a SHU. In addition, defendants are prohibited from returning any seriously mentally ill inmate to any SHU unit if said inmate has at any time following placement in a SHU required a higher level of mental health care.

## ORDER REVISING DEADLINES
## MAY 13, 2014.

During a telephone call with the court, the Special Master reported that he recommends and the parties agree in principle that certain deadlines set in the court's April 10, 2014 order (ECF No. 5131) be extended. In addition, the Special Master reports that an additional period of time is required to implement the provisions of paragraph 2e at 74:7-21 of said order.

Accordingly, good cause appearing, IT IS HEREBY ORDERED that:

1. The court's April 10, 2014 order (ECF No. 5131) is revised as follows:

a. The deadline set in paragraph 1a at 72:8-11 is extended to August 1, 2014.

b. Paragraph 2a at 72:23-73:10 is revised as follows:

Not later than August 1, 2014, defendants shall file a plan to limit or eliminate altogether placement of class members removed from the general population for non-disciplinary reasons in administrative segregation units that house inmates removed from the general population for disciplinary reasons. Defendants shall be prepared to fully implement the plan not later than September 1, 2014. If feasible, defendants shall commence forthwith to reduce the number of *Coleman* class members housed for non-disciplinary reasons in any administrative segregation unit that houses disciplinary segregation inmates; feasibility shall be determined by the Special Master. Commencing on September 1, 2014, defendants will be prohibited from

placing any class members removed from the general population for non-disciplinary reasons for more than seventy-two hours in administrative segregation units that house inmates removed from the general population for disciplinary reasons.

 c. The plan and protocol required by paragraph 2b at 73:11-18 shall be completed by August 1, 2014.

 d. Paragraph 2c at 73:19-74:3 is revised as follows:

Beginning August 1, 2014, defendants shall provide to the court and the Special Master monthly reports on whether each EOP ASU hub meets Program Guide requirements for an EOP ASU level of care. Commencing October 1, 2014, defendants shall not admit any *Coleman* class member at the EOP level of care to any EOP ASU hub that has failed to meet or exceed Program Guide requirements for a period of more than two consecutive months. Commencing October 1, 2014, defendants shall not place any class member at the EOP level of care in any administrative segregation unit during any period in which there are an insufficient number of EOP Ad Seg Hub beds available unless failure to remove the inmate from the general population presents an imminent threat to life or safety.

 e. The deadline set in paragraph 2d at 74:4-6 is extended to August 1, 2014.

 f. Not later than August 1, 2014, defendants shall commence implementation of the provisions of paragraph 2e at 74:7-21.

2. Except as expressly modified herein, all provisions of the court's April 10, 2014 order (ECF No. 5131) remain in full force and effect.

 IT IS SO ORDERED.